UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------:

Jabari Bishop,

Plaintiff,


CITY OF NEW YORK, "JOHN DOE P.O. #1", Said
name being fictitious, being the intention of Plaintiff to
designate the Male NYPD Officer Who Seized Plaintiff
from a Parked Motor Vehicle and Frisked Plaintiff, on
December 29, 2010, "JANE DOE P.O. #1", Said name being
fictitious, being the intention of Plaintiff to designate
the Female NYPD Officer Who Seized Plaintiff from
a Parked Motor Vehicle on December 29, 2010 and Searched
Plaintiff, and "JANE DOE P.O. #2", Said name being
fictitious, being the intention of Plaintiff to designate the
Female NYPD Officer Who Seized Plaintiff from a Parked
Motor Vehicle and Searched Plaintiff,

Defendants.

------------------------------------------------------------------:

**Index No.: 13-CV-9203    (LAP)**

**FIRST VERIFIED
AMENDED COMPLAINT
FOR VIOLATIONS OF 42 USC § 1983
THE FOURTH AMENDED OF THE
UNITED STATES CONSTITUTION
AND RELATED CLAIMS**


**PLAINTIFF DEMANDS JURY TRIAL
ON ALL ISSUES SO TRIABLE**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/16/14

## SUMMARY

1.    Plaintiff Jabari Bishop ("BISHOP") while sitting in the passenger seat of a legally parked motor vehicle, of which the engine was turned off, was illegally seized from said automobile and then unlawfully frisked and searched by at least three New York Police Department ("NYPD") officers (the "NYPD OFFICERS") under Defendant CITY of NEW YORK's unconstitutional "stop-and-frisk" program and for no reason other than being an African-American young male.

2.    Said unreasonable search and seizure of BISHOP's person by the NYPD OFFICERS was non-consensually and conducted unlawfully by the NYPD OFFICERS in a manner that did not meet the criteria for a "Terry search" and exceeded the bounds of the same.

3.    The NYPD conducts nearly seven hundred thousand (700,000) of these "stop-and-frisk" searches annually. While the U.S. Supreme Court requires that an officer conducting a stop-and-frisk have reason to believe an individual is armed and dangerous, here in New York, not even two percent of stop-and-frisks result in the recovery of a weapon. It is clear that either NYPD training is so poor that its officers are mistaken on their predictions of weapons possessions 79 out of 80 times, or that NYPD custom and/or policy allows and

1

encourages officers to utilize stop-and-frisk searching for purposes other than ensuring the safety of its officers (such as quotas), or for no purpose at all[1].

## JURY DEMAND

4.    Plaintiff BISHOP respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

### Plaintiff

5.    Plaintiff JABARI BISHOP is an African-American male a citizen of the United States, and at all relevant times a resident of the City and State of New York.

### Defendants

6.    At the time of the commencement of this action, Defendant CITY OF NEW YORK is and was at all times relevant herein, a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by the New York City Police Department.

7.    Defendant "JOHN DOE P.O #, 1", for identification purposes is assigned this "John Doe" defendant, is an unnamed police officer with the New York Police Department named and sued in his individual and official capacity, and illegally seized and searched BISHOP in Bronx County on December 29, 2010.

8.    Defendant "JANE DOE P.O. #1", for identification purposes is assigned this "Jane Doe" defendant, is an unnamed police officer with the New York Police Department named and sued in his individual and official capacity, illegally seized and searched BISHOP in Bronx County on December 29, 2010.

9.    Defendant "JANE DOE P.O. #2", for identification purposes is assigned this "Jane Doe" defendant, is an unnamed police officer with the New York Police Department named and sued in his individual and official capacity, unlawfully seized and searched BISHOP in Bronx County on December 29, 2010.

---

[1]  This number is based on self-reported statistics by the NYPD.

## JURISDICTION

10.   Plaintiff bring this action for compensatory damages, punitive damages, and attorneys' fees pursuant to Title 42 USC §§ 1981 *et. seq.*. 1983 *et. seq* , 1985 *et. seq*, 1986 *et. seq.*, and 1988 *et. seq.* for violations of his Civil Rights, as said rights are secured by said statutes and the Fourth and Fourteenth Amendment of the Constitution of the United States.

11.   Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

## VENUE

12.   Venue is properly laid in the Southern District of New York under 28 USC § 1391(b) in that, this is the District in which the claims arose.

## ALLEGATIONS OF FACT

13.   On December 29, 2010, between the hours of 12AM to 1AM, Plaintiff JABARI BISHOP awaited the return of his father from friend's home in in the passenger seat of a legally parked car, with engine turned off in front of 551 Rosedale Avenue, Bronx, New York 10473, a housing development named the Soundview Houses owned and operated by to the City of New York Housing Authority ("NYCHA").

14.   Prior to stopping and frisking, Plaintiff BISHOP, Defendants NYPD OFFICERS's planned and conspired to stop African-Americans under the CITY OF NEW YORK stop and frisk program. During the above mentioned date and times, Defendants NYPD OFFICERS surrounded the automobile in which Plaintiff JABARI BISHOP was sitting in the passenger seat.

15.   Defendants NYPD OFFICERS without cause or reason knocked on the window of the automobile, ordered Plaintiff JABARI BISHOP to roll down the window.

16.   Plaintiff JABARI BISHOP rolled down the window as ordered.

17.   Defendants NYPD OFFICERS without probable cause or reasonable suspicion ordered Plaintiff JABARI BISHOP out the car. Plaintiff BISHOP exited the car, whereupon, the Defendants NYPD OFFICERS without cause or reason, ordered Plaintiff JABARI BISHOP to stand against the car.

18.   Plaintiff JABARI BISHOP complied Defendants NYPD OFFICERS' orders and exited the car and stood against the car.

19.   As the NYPD OFFICERS frisked BISHOP they asked why he was in the area and if lived in the area.

20.   BISHOP protested and advised the NYPD OFFICERS that they had no right to stop, force him out of the car and search him.

3

21.  BISHOP as if he was free to leave.

22.  The NYPD OFFICERS said "NO!".

23.  Each of the NYPD OFFICERS proceeded to search Plaintiff BISHOP using a "frisk" method of search, whereby each police officer moved their hands over the clothing of Plaintiff BISHOP.

24. Each of the NYPD OFFICERS concentrated on the pockets of Plaintiff BISHOP's pants and coat for approximately one full minute, carefully palpating soft objects they could feel inside of them.

25.  There were no hard objects that could have even vaguely resembled a weapon in the areas on which the NYPD OFFICERS were concentrating.

26. At no point during this evening was Plaintiff BISHOP in possession of any weapons, drugs, or contraband of any kind.

27.  The NYPD OFFICERS completed their search and searched the back seat of the car and searched Plaintiff BISHOP's father laptop bag, which was located in the back seat of the subject motor vehicle.

28.  The NYPD OFFICERS then demand that Plaintiff BISHOP to remove the contents of his pockets. BISHOP declined to remove the contents of his pockets.

29.  The NYPD OFFICERS continued their questioning and repeatedly threatened BISHOP with spending the night in jail if he did not answer their questions.

30.  Plaintiff BISHOP continued to decline to answer all questions, except for his name.

31.  After approximately several minutes, the Defendants NYPD OFFICERS without explanation to Plaintiff BISHOP, decided to discontinue their questions and "investigation" and told BISHOP to "have a nice night."

32.  Defendant "P.O. Officer "John Doe #1" knew or should have known from his training that the "stop and frisk" of Plaintiff BISHOP was without reasonable suspicion, probable cause or legal justification, and at no time during the unreasonable seizure and search BISHOP, did Defendant "P.O. Officer John Doe #1" intercede and attempt to stop Defendant "P.O. Officer Jane Doe #2" and Defendant "P.O. Officer Jane Doe #3" from conducting said unreasonable search and seizure of BISHOP.

33.  Defendant P.O. Officer Jane Doe #2" knew or should have known from her training that the "stop and frisk" of Plaintiff BISHOP was without reasonable suspicion, probable cause or legal justification, and at no time during the unreasonable seizure and search BISHOP, did Defendant "P.O. Officer Jane Doe #2" intercede and attempt to stop Defendant "P.O. Officer John Doe #1" and Defendant "P.O. Officer Jane Doe #3" from conducting said unreasonable search and seizure of BISHOP.

4

34. Defendant "P.O. Officer Jane Doe #3" knew or should have known from her training that the "stop and frisk" of BISHOP was without reasonable suspicion, probable cause or legal justification, and at no time during the unreasonable seizure and search BISHOP, did Defendant "P.O. Officer Jane Doe #3" intercede and attempt to stop Defendant "P.O. Officer John Doe #1" and Defendant "P.O. Officer Doe Jane #2" from conducting said unreasonable search and seizure of BISHOP.

35. At no point during this evening was Plaintiff BISHOP in possession of any weapons, drugs or contraband of any kind.

36. There was nothing that stood out about Plaintiff BISHOP's appearance, clothing, behavior, or demeanor at the time he was confronted and at all times immediately prior, especially since he was seated in the passenger seat of a parked car.

37. There was nothing regarding Plaintiff BISHOP's appearance, clothing, behavior, or demeanor that would have suggested that he was armed or dangerous.

38. A reasonable individual would have had no reason to fear that Plaintiff BISHOP was armed or dangerous, or about to cause physical violence in any way.

## THE CITY OF NEW YORK DISCRIMINATORY "STOP & FIRSK" POLICY

39. On August 12, 2013, United States District Judge Shira Scheindlin, ruled that the New York Police Department violated the Constitution with its so-called stop-and-frisk program and that's said illegal program amounted to "indirect racial profiling" by targeting blacks and Hispanics disproportionate to their populations.

40. Prior to the Memorandum and Order of Judge Scheindlin that found "stop-and-frisk" unconstitutional, the NYPD's practice, and abuse, of "stop-and-frisk" searches has occurred for no less than decades, and the NYPD has been on notice of such.

41. Statistics released by the NYPD, year after year, admit to over 500,000 stop-and-frisks conducted annually, reaching an all-time high in 2011 of 684,330. See Exhibit A, "Critics Assail NYPD Stop-and-Frisk Tactics,"The Wall Street Journal. http://blogs.wsj.com/metropolis/2012/02/14/critics-assail-nypd-stop-and-frisk-tactics/, Exhibit B, "NYPD Stop-and-Frisk Statistics, 2009 and 2010," Center for Constitutional Rights. http://ccrjustice.org/files/CCR_Stop_and_Frisk_Fact_Sheet.pdf.

42. The population of New York City is approximately 8,000,000 people.

43. Based on the above, one's odds of getting stopped-and-frisked by the NYPD in a given year are approximately 1 in 12.

44. However, those odds are drastically changed when taking race into account – black people, for example, are nearly <u>ten times as likely</u> to be stopped-and-frisked as white people. *See* **Exhibit B**.

45. The high number of stop-and-frisk searches can be explained, at least in part, by NYPD supervisors setting quotas or quota-like "performance goals."

46. These quotas are often times treated as more important than respecting the rights of the public, by both supervisors and "street cops."

47. For example, in 2010, a whistleblower NYPD officer recorded his commanding officer directing him as follows: "Any roving bands – you hear me – roving bands of more than two or three people, I want them stopped. Cuffed. Throw them in here, run some warrants. You're on a foot post? Fuck it. Take the first guy you've got, lock them all up." *See* **Exhibit C**, "Is That a Tape Recorder in Your Pocket, or Are You Just Unhappy to See Me?" This American Life. http://www.thisamericanlife.org/radio-archives/episode/414/transcript.

48. The same whistleblower also recorded the following statement: "I see eight fucking summonses for a 20-day period or a month. If you mess up, how the hell do you want me to do the right thing by you? You come in, five parkers, three A's, no C's, and the only 250 you do is when I force you to do overtime? I mean it's a two-way street out here." *See* **Exhibit D**, "The NYPD Tapes: Inside Bed-Stuy's 81st Precinct," p. 3. The Village Voice. http://www.villagevoice.com/2010-05-04/news/the-nypd-tapes-inside-bed-stuy-s- 81st-precinct/3/.

49. In the above quotation, "250" is a reference to Form UF-250, a report filled out each time a stop-and-frisk is performed.

50. Despite the lawful purpose of a stop-and-frisk necessarily being the detection of weapons, only 1.25% of these searches actually yielded a weapon. *See* **Exhibit B**.

51. Approximately 90% of those stopped-and-frisked were not taken into custody or even issued a summons – in other words, were engaged solely in completely lawful behavior – and naturally a portion of the remaining 10% would find their cases dismissed.

52. Following the shooting death of Amadou Diallo, an unarmed man killed by NYPD officers in 1999, the New York State Attorney General issued a detailed report examining NYPD stop-and-frisk tactics which, among other things, concluded that no lawful basis for the stop had been recorded by officers in nearly 40% of the stops examined.

53. Based upon the NYPD-released statistics, published whistleblower reports, and Attorney General report, the NYPD was, or should have been, aware of the abuse of stop-and- frisks, and instead of

correcting the problem, the quantity of stop-and-frisks has increased by a rate of 14% in the last year, and over 100% since 2004. *See* **Exhibit A.**

## THE SUBJECT EVENTS WERE CAPTURED ON
## THE CITY OF NEW YORK SUVEILLANCE CAMERAS

54.   On December 29, 2010, in the confines of the NYPD's 43rd Precinct and/or the NYPD's Housing Bureau Police Service Area 8, the City of New York posted and stationed a NYPD's THV Mobile Command Center and/or a NYPD's "Sky Watch" retractable watchtower at Rosedale Avenue and Randall Avenue on December 29, 2010.

55.   The THV Mobile Command Center and NYPD's "Sky Watch" retractable watchtower have capabilities to record real events on their respective video/digital recorders at 360 angles at both daylight and the darkness of night.

56.   On December 29, 2010, the THV Mobile Command Center and NYPD's "Sky Watch" retractable watchtower captured Plaintiff BISHOP being subjected to Defendants' unlawful "stop and frisk" and unreasonable search and seizure.

57.   On December 30, 2011, Plaintiff served upon the City of New York Corporation Counsel and New York City Housing Authority, a Litigation Hold for the purpose of preserving any and all electronically stored information and video/digital surveillance that captured the subject events of December 29, 2010 on the video/digital cameras from the NYPD's THV Mobile Command Center and NYPD's "Sky Watch" retractable watchtower. A copy of the Litigation sent and received by the City of New York Corporation Counsel is appended hereto ad **Exhibit E.**

## NOTICE OF CLAIM

58.   Plaintiff JABARI BISHOP timely filed a Notice of Claim with the Comptroller of the City of New York within 90 days of the events complained of herein. More than 30 days has elapsed since the filing of the Notice of Claim, and adjustment or payment thereof has been neglected or refused.

## CAUSES OF ACTIONS ARISING FROM THE EVENTS
## THAT OCCURRED PRIOR TO AND ON DECEMBER 29, 2010

### AS AND FOR THE FIRST CLAIM
### Plaintiff Jabari Bishop's Claims Pursuant to 42 U.S.C. § 1983
### Against  Defendants "JOHN DOE P.O #, 1",  "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2"

59.   Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

60. Defendants "JOHN DOE P.O #, 1", Defendant "JANE DOE P.O #, 1", and Defendant "JANE DOE P.O #, 2" are "persons," as that term is used in the text of 42 U.S.C. § 1983. The conduct of Defendants "JOHN DOE P.O #, 1", Defendant "JANE DOE P.O #, 1", and Defendant "JANE DOE P.O #, 2" in seizing and searching Plaintiff JABARI BISHOP was performed under color of law and without any objective articulable reasonable suspicion of criminality, probable cause of criminality or other constitutionally required grounds.

61. As a direct and proximate result of such acts, Defendants "JOHN DOE P.O #, 1", Defendant "JANE DOE P.O #, 1", and Defendant "JANE DOE P.O #, 2", deprived Plaintiff JABARI BISHOP of his Fourth Amendment rights in violation of 42 U.S.C. § 1983.

62. As a direct and proximate result of those constitutional abuses, Plaintiff JABARI BISHOP has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

63. The acts of Defendants "JOHN DOE P.O #, 1"'s, Defendants "JANE DOE P.O #, 1"'s, and "JANE DOE P.O #, 2"'s;were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff BISHOP to an award of punitive damages.

## AS AND FOR THE SECOND CLAIM
### Plaintiff Jabari Bishop's Monell Claims Against the City of New York
### Pursuant to 42 U.S.C. § 1983

64. Plaintiff BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

65. Defendants CITY OF NEW YORK is a "person[]," as that term is used in the text of 42 U.S.C. § 1983. Defendant CITY knowingly maintains and permits official sub-rosa policies or customs of permitting the occurrence of the kinds of wrongs set forth above, by deliberate indifference to widespread police abuses, failing and refusing to impartially investigate, discipline or prosecute police officers who commit unconstitutional violations of citizens' rights and crimes of violence, each ratified and approved by CITY OF NEW YORK has directly and proximately caused the NYPD's policy, practice and/or custom of suspicionless traffic stops and frisks in violation of the Fourth Amendment, with deliberate indifference to the constitutional rights of Plaintiff BISHOP by devising, implementing, enforcing, adopting, sanctioning and ratifying a policy, practice and/or custom of:

(a) failing to properly screen, train, and supervise NYPD officers;

(b) failing to adequately monitor and discipline the NYPD and its officers; and

(c) encouraging, sanctioning and failing to rectify the NYPD's constitutional abuses.

66. As a direct and proximate result of the aforesaid acts and omissions, Defendants CITY OF NEW YORK through have deprived Plaintiff BISHOP of his Fourth Amendment rights in violation of 42 U.S.C. § 1983.

67. The acts and omissions of Defendants CITY OF NEW YORK, explained herein were intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiff BISHOP to an award of punitive damages. In engaging in such conduct, Defendant CITY OF NEW YORK acted beyond the scope of its jurisdiction, without authority under law, and in abuse of its powers.

## AS AND FOR THE THIRD CLAIM
### SUPERVISORY VIOLATIONS OF 42 U.S.C. § 1983
### Against Pursuant to 42 U.S.C. § 1983 Defendant City of New York
### Failure to Train, Control and Supervise the Defendant Police Officers Defendants Resulted in Violations of Plaintiff Jabari Bishop' Constitutional and Civil Rights

68. Plaintiff BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

69. Defendants are "persons," as that term is used in the text of 42 U.S.C. § 1983. Defendant CITY OF NEW YORK knew, or should have known, about Defendants "JOHN DOE P.O #, 1'"s, "JANE DOE P.O #, 1'"s, and "JANE DOE P.O #, 2'"s abuses of authority as police officers and numerous violations of citizens Constitution Rights and Civil Rights. Despite having information and knowledge of Defendants "JOHN DOE P.O #, 1'"s, Defendants "JANE DOE P.O #, 1'"s, and "JANE DOE P.O #, 2'"s abuses of authority as police officers and numerous violations of citizens' Constitutional Rights and Civil Rights, Defendant directly failed to take meaningful preventative or remedial action.

70. Defendant 's actions, omissions and inaction evidenced a direct reckless and callous disregard for, and deliberate indifference to Plaintiff BISHOP's constitutional rights, by impartially and adequately investigating claims against police misconduct perpetrated by Defendants "JOHN DOE P.O #, 1'"s, Defendants "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2".

71. As a direct and foreseeable consequence of these acts and omissions, Plaintiff BISHOP was deprived of his rights under the Fourth Amendment to the United States Constitution.

72.  As a direct and foreseeable consequence of these deprivations, Plaintiff BISHOP has suffered physical harm, emotional trauma and loss of liberty.

## AS AND FOR THE FOURTH CLAIM
### CONSPIRACY IN VIOLATION 42 U.S.C. § 1983
**Against Defendants "JOHN DOE P.O #, 1"'s, "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2" in their individual and official capacities  for violations of  Bishop's Constitutional Rights <u>Pursuant to 42 U.S.C. § 1983</u>**

73.  Plaintiff Jabari BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

74.  Defendants "JOHN DOE P.O # 1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" are "persons," as that term is used in the text of 42 U.S.C. § 1983 conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves to deprive Plaintiff BISHOP of his constitutional rights by conducting "stops and frisks" in the CITY OF NEW YORK not based upon articulable objective reasonable suspicion of criminality or probable cause that a crime has been in fact committed or is about to be committed.

75.  Defendant CITY OF NEW YORK willfully participated in this illegal objective by various means, namely the implementation and enforcement of CITY OF NEW YORK's policy conducting "stops and frisks" in the CITY OF NEW YORK not based upon articulable objective reasonable suspicion of criminality with the intent to further some purpose of the conspiracy, including, for example: **(1)** to circumvent and do an end run around Constitutional protections of the Fourth Amendment in the name of effective crime fighting and keeping low crime statistics; and **(2)** maintain low levels of crime; and **(3)** meet arbitrary "productivity arbitrary "productivity standards" or *de facto* quotas of a certain number of traffic stops and specific types of arrests, some purpose of the conspiracy, including, for example: to circumvent and do an end run around Constitutional protections of the Fourth Amendment in the name of effective crime fighting and keeping low crime statistics.

## AS AND FOR THE FIFTH CLAIM
### VIOLATION Title 42 U.S.C. § 1981 *et. seq.*
**Against Defendants "JOHN DOE P.O #, 1"'s, "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2" in  their individual and official capacities  for violations of  Bishop's Constitutional Rights**

76.  Plaintiff Jabari BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

77.  Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" initiated

contact with BISHOP based solely on his race, namely an African-American, As BISHOP refused to answer any questions other than his name, Defendants "JOHN DOE P.O #, 1", "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2" gave no to detain BISHOP between the time that they approached BISHOP and the time that they told him he was being detained.

78. Plaintiff BISHOP's detention constitutes an infringement on the "security of [his] person[.]" Defendant City of New York is responsible for the training of all New York Police Department officers.

79. The fact that Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" did not object to the furtherance of this detention over the course of several minutes is *prima facie* evidence that this was not simply a case of an officer failing to use good judgment, but rather three police officers who were not properly trained as to the requirements of their duties.

**AS AND FOR THE SIXTH CLAIM**
**VIOLATION OF THE FOURTH AMENDMENT TO THE**
**UNITED STATES CONSTITUTION (UNLAWFUL SEIZURE)**
**Against Defendants "JOHN DOE P.O #, 1"'s, "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2"**
**in their individual and official capacities for violations of Bishop's Constitutional Rights**

80. Plaintiff Jabari BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

81. "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" initiated contact with BISHOP without any articulable reason permitted by the U.S. Constitution and/or federal law.

82. Despite not having any articulable reason permitted by the U.S. Constitution and/or federal law to detain BISHOP, "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" did so anyway.

83. The fact that "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2"did not object to the furtherance of this detention over the course of several minutes is *prima facie* evidence that this was not simply a case of an officer failing to use good judgment, but rather three police officers who were not properly trained as to the requirements of their duties.

**AS AND FOR THE SEVENTH CLAIM**
**VIOLATION OF THE FOURTH AMENDMENT TO THE**
**UNITED STATES CONSTITUTION - SEARCH JUSTIFICATION**
**Against Defendants "JOHN DOE P.O #, 1"'s, "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2"**
**in their individual and official capacities for violations of Bishop's Constitutional Rights**

84. Plaintiff BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

11

85.  Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" approached BISHOP without any articulable reason permitted by the U.S. Constitution and/or federal law.

86.  As Plaintiff BISHOP protested of being questions and frisked by "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" gained no additional reasons to detain PLAINTIFF BISHOP between the time that they approached PLAINTIFF BISHOP and the time that they told him he was being detained.

87.  The only type of non-consensual search permitted while both reasonable suspicion and a warrant are lacking is a "Terry search."

88.  A Terry search requires at least some articulable suspicion that the individual encountered by the police is armed and dangerous.

89.  Absent from this encounter was <u>any</u> reason to think that PLAINTIFF BISHOP was armed, dangerous, or in any way about to cause any harm to anyone.

90.  Despite the fact that PLAINTIFF BISHOP was being illegally detained and there was no reason for "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2"to fear for their safety, these officers conducted a non-consensual search of PLAINTIFF BISHOP.

91.  The CITY OF NEW YORK oversees the New York Police department and was aware of the rampant abuse of stop-and-frisk of which PLAINTIFF BISHOP became a victim, yet failed to correct it.

92.  The fact that "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" did not object to the this search is *prima facia* evidence that this was not simply a case of an officer failing to use good judgment, but rather three police officers who were not properly trained as to the requirements of their duties.

### AS AND FOR THE EIGHTH CLAIM
### VIOLATION OF THE FOURTH AMENDMENT TO THE
### UNITED STATES CONSTITUTION - UNLAWFUL SEARCH INTENSITY
### Against Defendants "JOHN DOE P.O #, 1"', "JANE DOE P.O #, 1", and "JANE DOE P.O #, 2"
### <u>in their individual and official capacities for violations of Bishop's Constitutional Rights</u>

93.  Plaintiff BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

94.  The only type of non-consensual search permitted while both reasonable suspicion and a warrant are lacking is a "Terry search."

95.  The sole purpose of a Terry search is to find weapons which may be immediately used by the individual being searched to harm the officers but for the Terry search.

96.   Any touching, looking, prodding, lifting, or any other variety of contact whatsoever beyond what is necessary to find a weapon is strictly prohibited of an officer conducting a Terry search.

97.   Despite this fact, the officer searching PLAINTIFF BISHOP touched and manipulated soft objects within PLAINTIFF BISHOP's pockets for an extended period of time.

98.   Any manipulation of soft objects is beyond the bounds of a Terry search. Any search that extends more than the amount of time reasonably necessary to determine the presence of weapons – somewhat large, hard objects – is beyond the bounds of a Terry search.

99.   The CITY OF NEW YORK oversees the New York Police department and was aware of the rampant abuse of stop-and-frisk of which PLAINTIFF BISHOP became a victim, yet failed to correct it.

100.   The fact that Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" did not object to the this search is *prima facie* evidence that this was not simply a case of an officer failing to use good judgment, but rather three police officers who were not properly trained as to the requirements of their duties.

### AS AND FOR THE NINTH CLAIM
### Jabari Bishop's Claim Pursuant to 42 U.S.C. § 1985(2)
### <u>Against All Named Individual Defendants</u>

101.   Plaintiff BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

102.   Commencing on prior to December 29, 2010 and thereafter, Defendants and two or more of them, in the State of New York, in the City of New York, by reason of Defendants' animus against African-Americans and persons of color, which class Plaintiff belongs, invidiously discriminated and conspired together to act and to fail to act as hereinbefore alleged, for the purpose of impeding, hindering, obstructing, and defeating the due course of justice in the State of New York, in the City of New York.

103.   Defendants, and each of them, purposefully, under color of law, planned and conspired to deny Plaintiff equal protection of the laws by (a) denying the right to be free from unreasonable search and seizure; and (b) denying the right not to be deprived of property and liberty without due process of law.

104.   By virtue of the foregoing, Defendants, and each of them, violated 42 U.S.C. § 1985 (2).

105.   As a direct and proximate result of the foregoing, Plaintiff has been damaged as recited above and demands and is entitled to the damages recited in this First Verified Amended Complaint, including but not limited to, general and punitive damages (except as to Defendant CITY) and attorney's fees.

## AS AND FOR THE TENTH CLAIM
### Jabari Bishop's Claim Pursuant to 42 U.S.C. § 1985(3)
### <u>Against All Named Individual Defendants</u>

106.  Plaintiff BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

107.  By virtue of the foregoing, Defendants and two or more of them, conspired for the purpose of depriving Plaintiff of (a) equal protection of the law; and (b) equal protection and immunities under the law; and for the purpose of preventing and hindering the constituted authorities from giving and securing to Plaintiff equal protection of the law an deprivation of liberty and property without due process of law.

108.  Defendants, and each of them, did and caused to be done, an act or acts in furtherance of the object of the conspiracy, whereby Plaintiff was deprived of the rights and privileges as set forth above.

109.  As a direct proximate result of the foregoing, Plaintiff has been damaged as recited above and demands and is entitled to the damages recited in this First Verified Amended Complaint, including, but not limited to, general and punitive damages (except as to Defendant CITY) and attorney's fees.

## AS AND FOR THE ELEVENTH CLAIM
### Jabari Bishop's Claim Pursuant to 42 U.S.C. § 1986
### <u>Against All Defendants for the Failure to Intervene</u>

110.  Plaintiff BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

111.  Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" are "persons," as that term is used in the text of 42 U.S.C. § 1983.

112.  Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2", each of them, had knowledge of all facts alleged herein, including that the acts conspired together in violation of Titles 42 United States Code §§ 1983 and 1981, engaged in acts in furtherance of a conspiracy by seizing Plaintiff BISHOP based upon him being an African-American and without objective articulable suspicion of criminality and/or probable cause that a crime was in fact committed or was about to be committed, as a crime fighting tool to keep crime rates low and to instill fear in citizens and visitors of City of New York that they can be stopped by NYPD at any time for any reason or for no reason, thus depriving  BISHOP of his right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution.

113.  Defendants CITY OF NEW YORK, Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2", each of them, by virtue of their relationships with each other defendant, their

authority under color of law, and professional duties, had authority, power to prevent or aid in preventing deprivation of Plaintiff BISHOP's right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution.

114.   Defendants CITY OF NEW YORK,  Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2", and each of them, neglected or refused to exercise their authority and powers to prevent or aid in preventing the deprivation of Plaintiff BISHOP's right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution.

115.   The acts as alleged herein were in fact committed as alleged.

116.   As an actual and proximate result, Plaintiff BISHOP has been harmed and injured.

## AS AND FOR THE TWELFTH CLAIM
### Jabari Bishop's Claim Pursuant to 42 U.S.C. § 1986
### <u>Against All Defendants for the Failure to Intervene</u>

117.   Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

118.  Defendants CITY OF NEW YORK, Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2" are "persons," as that term is used in the text of 42 U.S.C. § 1983.

119.  Defendants CITY OF NEW YORK,  Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2", each of them, had knowledge of all facts alleged herein, including that the acts conspired together in violation of Title 42 United States Code § 1983, engaged in acts in furtherance of a conspiracy by seizing Plaintiff JABARI BISHOP without objective articulable suspicion of criminality and/or probable cause that a crime was in fact committed or was about to be committed, as a crime fighting tool to keep crime rates low and to instill fear in citizens and visitors of CITY OF NEW YORK that they can be stopped by NYPD at any time for any reason or for no reason, thus depriving JABARI BISHOP of his right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution.

120.  Defendants CITY OF NEW YORK, Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2", each of them, by virtue of their relationships with each other defendant, their authority under color of law, and professional duties, had authority, power to prevent or aid in preventing deprivation of Plaintiff JABARI BISHOP's right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution, as alleged in the within this First Verified Amended Complaint.

15

121.   Defendants CITY OF NEW YORK, "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2", and each of them, neglected or refused to exercise their authority and powers to prevent or aid in preventing the deprivation of Plaintiff JABARI BISHOP's right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution, as alleged in the within Third Verified Amended Complaint.

122.   The acts as alleged herein were in fact committed as alleged.

123.   As an actual and proximate result, Plaintiff JABARI BISHOP has been harmed and injured.

## AS AND FOR THE THIRTEENTH CLAIM
## PURSUANT TO 42 U.S.C. § 1983
## DEPRIVATION OF FOURTHEENTH AMENDMENT
## RIGHTS TO EQUAL PROTECTION OF THE LAW
## UNDER THE UNITED STATES CONSTITUTION
### Against All Named Defendants

124.   Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

125.   By the acts alleged herein, Defendants, acting under color of state law and in their individual and official capacities and within the scope of their employment, have deprived each Plaintiff BISHOP of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

126.   As a direct and proximate result of the misconduct described above, Plaintiff BISHOP was detained on December 29, 2010, have  suffered injury and damages including, *inter alia*, physical and mental pain, suffering and mental anguish.

127.   Because Defendants, acting under color of state law, in their individual and official capacities and within the scope of their employment, detained Plaintiff BISHOP based upon him being an African-American under the Defendant CITY OF NEW YORK's stop and frisk program, wherein, Caucasian citizens who are similarly situated as Plaintiff, are not subject to a race based stop and frisk program.

128.   The acts as alleged herein were in fact committed as alleged.

129.   As an actual and proximate result, Plaintiff JABARI BISHOP has been harmed and injured.

16

## AS AND FOR THE FOURTEENTH CLAIM
## VIOLATIONS OF THE NEW YORK STATE CONSTITUTION
### Against All Named Defendants

130.   Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

131.   Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2",  subjected Plaintiffs to the foregoing acts and omissions without due process of law, thereby depriving Plaintiffs of rights, privileges, and immunities secured by Article I, §§ 11, and 12 of the New York State Constitution, including, without limitation, the following deprivations of his rights, privileges, and immunities:

> i. Plaintiff was deprived of his right to equal protection under the law and was subjected to discrimination based on his race and color, to wit: an African-American, in violation of New York State Constitution Article 1, § 11; and

> ii. Plaintiff were deprived of his right to be free from unreasonable searches and seizures, in violation of New York State Constitution Article 1, § 12

## AS AND FOR THE FIFTEENTH CLAIM
## COMMON LAW FALSE ARREST/FALSE IMPRISONMENT
### Against the All Named Individuals

132.   Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

133.   At all relevant times, Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2" subjected Plaintiff BISHOP, to false arrest and false imprisonment in violation of the laws of New York State, since the Plaintiff was wrongfully, unlawfully, unjustifiably, and forcibly detained and deprived of his liberty against his will. Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2"  did so while under color of state law.

134.   At all relevant times, Plaintiff BISHOP did not commit a crime or violation on December 29, 2010.

135.   Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2"  herein, had no information and never suspected or accused Plaintiff BISHOP of crimes or violation of any law or ordinance on December 29, 2010.

136.  Despite Plaintiff BISHOP's innocence, Defendants "JOHN DOE P.O #1", "JANE DOE P.O #
1", and "JANE DOE P.O # 2"  intentionally confined Plaintiff BISHOP without his consent.

137.  Plaintiff BISHOP, was aware of his confinement by Defendants "JOHN DOE P.O #1",
"JANE DOE P.O # 1", and "JANE DOE P.O # 2".

138.  Plaintiff BISHOP did not consent being confined by Defendants "JOHN DOE P.O #1",
"JANE DOE P.O # 1", and "JANE DOE P.O # 2".

139.  By reason of the foregoing, Plaintiff BISHOP no fault of his own has suffered and demands
consequential damages, compensatory damages, pecuniary damages, non - pecuniary damages and
punitive damages, from the Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE
P.O # 2".

140.  The limitations on liability as set forth in CPLR § 1601 do not apply.

141.  The limitations on liability set forth in CPLR § 1601 do not apply by reason of one or more of
the exceptions set forth in CPLR § 1602.

142.  By reason of the foregoing. Plaintiff BISHOP demands compensatory damages from
Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2".

143.  As a result of the foregoing false arrest/false imprisonment upon Plaintiff BISHOP, Plaintiff
BISHOP was injured.

144.  The limitations on liability as set forth in CPLR § 1601 do not apply.

145.  By reason of the foregoing. Plaintiff BISHOP demands compensatory damages from the
Defendants "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2" in a sum in excess
of the jurisdictional limits of all lower Courts.

## AS AND FOR THE SIXTEENTH CLAIM
## COMMON LAW ASSAULT
### Against All Named Individuals

146.  Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the
paragraphs stated herein-above as though same were fully set forth herein.

147.  By aggressively approaching Plaintiff BISHOP in fashion to physically attack and intimidate
Plaintiff, by banging the car window violently, Defendants "JOHN DOE P.O #1",  "JANE DOE P.O #

1", and "JANE DOE P.O # 2" caused Plaintiff to fear for his physical well-being and safety and placed Plaintiff in imminent apprehension of immediate harmful and offensive touching.

148.   The aforesaid assault upon Plaintiff BISHOP was not consented to by Plaintiff, nor was same otherwise privileged.

149.   As a result of the foregoing assault, Plaintiff BISHOP was injured.

150.   The limitations on liability as set forth in CPLR § 1601 do not apply.

151.   The limitations on liability set forth in CPLR § 1601 do not apply by reason of one or more of the exceptions set forth in CPLR § 1602.

152.   By reason of the foregoing, Plaintiff BISHOP no fault of his own has suffered and

153.   By reason of the foregoing, Plaintiff BISHOP no fault of his own has suffered and demands consequential damages, compensatory damages, pecuniary damages, n on - pecuniary damages and punitive damages, from the Defendants  "JOHN DOE P.O #1",  "JANE DOE P.O # 1", and "JANE DOE P.O # 2"  in a sum in excess of the jurisdictional limits of all lower Courts.

## AS AND FOR THE SEVENTEENTH CLAIM
### COMMON LAW ASSAULT
<u>Against All Named Individuals</u>

154.   Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.

155.   Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2",  without BISHOP's consent, subjected BISHOP to unwanted physical and immediate harmful, offensive touching, offensive pushing and offensive grabbing of BISHOP's person, and by offensively using their bodies as human barricades to block BISHOP's only means of egress and forward progress.

156.   The aforesaid battery upon Plaintiff BISHOP was offensive and was not consented to  by Plaintiff BISHOP, nor  was same otherwise privileged.

157.   As a result of the foregoing  battery upon Plaintiff BISHOP, Plaintiff BISHOP  was injured.

158.   The limitations on liability as set forth in CPLR § 1601 do not apply.

159.   The limitations on liability set forth in CPLR § 1601 do not apply by reason of one or more of the

exceptions set forth in CPLR § 1602.

160. By reason of the foregoing. Plaintiff BISHOP demands compensatory damages from the Defendants Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.in a sum in excess of the jurisdictional limits of all lower Courts.

161. By reason of the foregoing, Plaintiff BISHOP no fault of his own has suffered and demands consequential damages, compensatory damages, pecuniary damages, non- pecuniary damages and punitive damages, from the Plaintiff JABARI BISHOP repeat and reiterate each and every allegation contained in the paragraphs stated herein-above as though same were fully set forth herein.in a sum in excess of the jurisdictional limits of all lower Courts.

### AS AND FOR A EIGHTEETH CAUSE OF ACTION
#### Against All Named Defendants – Jointly and/or Severally
#### Bias-related Violence or Intimidation Because of Race and Color
#### In Violation of New York State Civil Rights Law § 79-n (2)

162. Plaintiff BISHOP repeats and reiterates each and every alleged at on contained in the paragraphs stated herein-above as though same were fully set forth herein.

163. Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2", each intentionally selected Plaintiff BISHOP to cause him harm because of a belief or perception regarding Plaintiff BISHOP's actual or perceived racial, color and ancestry of being an African-American in violation of NYS Civil Rights Law § 79-n (2).

164. Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1", and "JANE DOE P.O # 2" each intimidated Plaintiff BISHOP to cause him harm because of a belief or perception regarding Plaintiff BISHOP's actual or perceived racial, color and ancestry of being an African-American in violation of NYS Civil Rights Law § 79-n (2).

165. As a result of each Defendants' bias-related violence against and intimidation of Plaintiff BISHOP, Plaintiff BISHOP suffered and continues to suffer mental anguish, emotional distress, humiliation, indignity, and other injuries, thereby entitling him to compensatory damages pursuant to NYS Civil Rights Law § 79-n (2).

166. Each Defendants' bias related violence against and intimidation of Plaintiff BISHOP was deliberate, reckless, malicious, reprehensible, oppressive, and outrageous, showing a conscious indifference

20

and utter disregard the safety and Civil Rights of Plaintiff Samaad Bishop, thereby entitling him to punitive damages pursuant to NYS Civil Rights Law § 79-n (2).

167.   Plaintiff BISHOP is also entitled to cost maintaining this cause of action, including reasonable attorney's fees (should BISHOP retain counsel) under NYS Civil Rights Law § 79-n (4).

**WHEREFORE,** the named Plaintiffs pray that the Court will:

a)   Issue a judgment declaring that the NYPD's policy, practice and/or custom of suspicionless traffic stops and frisks challenged herein is unconstitutional in that it violates the Fourth Amendment to the United States Constitution, and that its implementation, enforcement and sanctioning by NYPD officers is a direct and proximate result of the following policies, practices and/or customs of the CITY OF NEW YORK and :

    i)   failing to adequately screen, train and supervise officers;

    ii)   failing to adequately monitor the NYPD and its officers and discipline those NYPD officers who violate the constitutional rights of residents of the communities they patrol; and

    iii)   encouraging, sanctioning, and failing to rectify the NYPD's unconstitutional stops and frisks.

b)   Issue an Order for the following injunctive relief:

    i)   enjoining the NYPD from continuing its policy, practice and/or custom of suspicionless traffic stops and frisks;

    ii)   enjoining the NYPD from continuing its policy, practice and/or custom of conducting traffic stops and frisks not based on reasonable objective suspicion of criminality by individuals and probable cause of criminality;

    iii)   enjoining the use of formal or informal productivity standards or other de *facto* quotas for arrests and/or traffic stops and frisks by NYPD officers;

    iv)   requiring CITY OF NEW YORK, and , to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the NYPD; and

    v)   requiring the CITY OF NEW YORK and to deploy NYPD officers with appropriate and adequate supervision;

c)   Award named Plaintiff JABARI BISHOP compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

d)     Award named Plaintiff BISHOP and JABARI BISHOP damages against
Defendants CITY OF NEW YORK, Defendants "JOHN DOE P.O #1", "JANE DOE P.O # 1",
and "JANE DOE P.O # 2", to the extent that their liability is based upon reprehensible actions
and/or inaction undertaken in their individual capacities, in an amount which is fair, just and
reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

e)     Award Plaintiff JABARI BISHOP reasonable attorneys' fees pursuant to 42 U.S.C. §
1988, should they retain counsel;

f)     Award all Plaintiffs, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

g)     Award such other and further relief as this Court may deem appropriate and equitable,
including injunctive and declaratory relief as may be required in the interests of
justice.

State of New York     )
County of New York  ) ss.:

## VERIFICATION

   **WHEREFORE**, witness whereof, JABARI BISHOP, being duly sworn, says that he is the affiant
herein, that the foregoing First Verified Amended Complaint is true to his own knowledge, except as to
matters therein stated to be alleged on information and belief, and as to those matters he believe it to be true, I
have hereunto set hands to sign on the date next below written:

Jabari Bishop

Sworn to before me this
15th day of May 2014

Notary Public

**DOLORES SCOTT**
**Notary Public State of New York**
**No. 01SC6293065**
**Qualified in New York County**
**Commission Expires November 18, 2017**

22

Defendant CITY knowingly maintains and permits official sub-rosa policies
or customs of permitting the occurrence of the kinds of wrongs set forth above, by
deliberate indifference to widespread police abuses, failing and refusing to impartially
investigate, discipline or prosecute peace officers who commit acts of felonious
dishonesty and crimes of violence, each ratified and approved by CITY, FPD and
SELLERS.

20. The unconstitutional policies, practices or customs promulgated, sanctioned
or tolerated by Defendants CITY, FPD and SELLERS include, but are not limited to:

(1) Defendants CITY and SELLERS had knowledge, prior to and since
this incident, of repeated allegations of abuse and assaultive misconduct toward detainees
and arrestees. Specifically, CITY and SELLERS knew Defendants had in the past
committed acts of police abuse, dishonesty and prevarication;

(2) Defendants CITY and SELLERS had knowledge, prior to and since
this incident, of similar allegations of abuse and dishonesty by Defendants, and refused to
enforce established administrative procedures to insure the safety of detainees and
arrestees;

(3) Defendants CITY and SELLERS refused to adequately discipline
individual officers and employees found to have committed similar acts of abuse and
misconduct;

(4) Defendants CITY and SELLERS refused to competently and
impartially investigate allegations of abuse and misconduct alleged to have been
committed by Fullerton Police Department officers;

(5) Defendants CITY and SELLERS reprimanded, threatened,
intimidated, demoted and fired officers who reported acts of abuse by other officers;

(6) Defendants CITY and SELLERS covered up acts of misconduct and
abuse by Fullerton Police Department officers and sanctioned a code of silence by and
among officers;

(7) Defendants CITY and SELLERS rewarded officers who displayed
aggressive and abusive behavior towards detainees and arrestees;

(8) Defendants CITY and SELLERS failed to adequately train and
educate officers in the use of reasonable and proper force and failed to enforce the
department's written regulations with respect to uses of force;

(9) Defendant CITY and SELLERS failed to adequately supervise the
actions of officers under their control and guidance;

(10) Defendants CITY and SELLERS condoned and participated in the
practice of prosecuting known groundless criminal charges for the purpose of insulating
the CITY of FULLERTON, FPD and its officers from civil liability and reducing or
dismissing criminal charges against individuals in return for release from civil liability;

(11) Defendants CITY and SELLERS condone and encourage a conspiracy
of silence among their employees for the purpose of concealing and furthering wrongful
and illegal conduct by their employees;

(12) Defendants CITY, FPD and SELLERS engaged in the practice and
custom of withholding from criminal defendants, judges and prosecutors, known Brady
evidence unfavorable to their officers in violation of law and the Constitution.

(13) Defendants CITY, FPD and SELLERS fostered and encouraged an
atmosphere of lawlessness, abuse and unconstitutional misconduct, which by October

- 10 -

1
2
3
4
5
6

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2010 and thereafter, represented the unconstitutional policies, practices and customs of
the CITY.
21. By reason of the aforesaid policies, customs, practices and usages, Plaintiff's
rights under the First, Fourth, and Fourteenth Amendments to the United States
Constitution were deprived.

THIRD CAUSE OF ACTION
(VIOLATION OF 42 U.S.C. § 1985 (2))
(By Plaintiff Against All Individual Defendants)
22. Plaintiff refers to and re-pleads each and every allegation contained in
paragraphs 1 through 21 of this complaint, and by this reference incorporates the same
herein and makes each a part hereof.
23. Commencing on October 23, 2010 and thereafter, Defendants and two or
more of them, in the State of California, County of Orange, by reason of Defendants'
animus against minorities, including Asian Americans and Cambodians of which class
Plaintiff belongs, invidiously discriminated and conspired together to act and to fail to act
as hereinbefore alleged, for the purpose of impeding, hindering, obstructing, and
defeating the due course of justice in the State of California and County of Orange.
24. Defendants, and each of them, purposefully, under color of law, planned and
conspired to deny Plaintiff equal protection of the laws by (a) denying the right to be free
from unreasonable search and seizure; and (b) denying the right not to be deprived of
property and liberty without due process of law.
25. By virtue of the foregoing, Defendants, and each of them, violated 42 U.S.C.
§ 1985 (2).
26. As a direct and proximate result of the foregoing, Plaintiff has been damaged
as recited above and demands and is entitled to the damages recited in the First Cause of
Action, including but not limited to, general and punitive damages (except as to
Defendant CITY) and attorney's fees.
-

FOURTH CAUSE OF ACTION
(VIOLATION OF 42 § 1985 (3))
(By Plaintiff Against All Individual Defendants)
27. Plaintiff refers to and re-pleads each and every allegation contained in
paragraphs 1 through 26 of this complaint, and by this reference incorporates the same
herein and makes each a part hereof.
28. By virtue of the foregoing, Defendants and two or more of them, conspired

for the purpose of depriving Plaintiff of (a) equal protection of the law; and (b) equal protection and immunities under the law; and for the purpose of preventing and hindering the constituted authorities from giving and securing to Plaintiff equal protection of the law an deprivation of liberty and property without due process of law.

29. Defendants, and each of them, did and caused to be done, an act or acts in furtherance of the object of the conspiracy, whereby Plaintiff was deprived of the rights and privileges as set forth above.

30. As a direct proximate result of the foregoing, Plaintiff has been damaged as recited above and demands and is entitled to the damages recited in the First Cause of Action, including, but not limited to, general and punitive damages (except as to Defendant CITY) and attorney's fees.

FIFTH CAUSE OF ACTION
(VIOLATION OF 42 U.S.C. § 1986)
(By Plaintiff Against All Individual Defendants)

31. Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 30 of this complaint, and by this reference incorporates the same herein and makes each a part hereof.

32. Commencing on October 23, 2010, Defendants, and each of them knew and understood Plaintiff was being subjected to a deprivation of his constitutional rights and

 Click here to Reply or Forward

25

**Exhibit A**

FEBRUARY 14, 2012, 6:25 PM ET

# Critics Assail NYPD Stop-and-Frisk Tactics

| Search Metropolis | SEARCH |

| Article | Comments (5) |

METROPOLIS HOME PAGE »

Email    Print          Like  24    Send          +More       Text

By Pervaiz Shallwani

Joseph Midgley, who identifies himself as a homeless New Yorker, is no stranger to the New York Police Department's stop-and-frisk policy.

"I have been stopped and frisked four times," said Midgley, who volunteers with the advocacy group Picture the Homeless. In each instance, he said, police asked if he had anything illegal and proceeded to search him even after he said no. "I was never ever charged, never even given a ticket."



**Stop Stats**

Instances of NYPD officers employing the stop-and-frisk tactic

■Black ■Latino ■White ■Other

2011: ▲14%

600,000

450,000

300,000

150,000

0

2004   '06   '08   '10

Source: New York Civil Liberties Union The Wall Street Journal

Midgley joined a group of critics who turned out Tuesday to challenge police tactics on the steps of City Hall. The event came in the wake of The Wall Street Journal's report that police performed a record-high 684,330 stops last year.

The number of stops jumped by 14% over 2010 totals — a pattern of increases that has been repeated nearly every year since Mayor Michael Bloomberg took office in 2002, said Darius Charney, lead attorney in a lawsuit challenging the stop-and-frisk policy. In Bloomberg's first year, the number of people stopped by police was under 100,000, he said.

Civil rights advocates, Manhattan Borough President Scott Stringer and City Council members participated in the press conference, calling on the Bloomberg administration to change the way stop-and-frisks are used and charging that the current system is racially biased.

"Acknowledge that this is a problem," said City Council Member Jumaane Williams. "I am not against stop and frisk as a police tactical tool, but it is being abused in my community in a way that would never be allowed."

Critics noted, as the Journal reported, that 84% of those stopped in 2011 were black and Latino.  "Little wonder, then, that police in New York City is a tale of two cities," said Donna Lieberman, executive director of the New York Civil Liberties Union.

She said blacks are stopped more than six times as often as whites, while Latinos are stopped by police four times more frequently than whites. Men of color between the ages of 14 and 24 make up 7.2% of the city's population but account for 41% of the stops, Lieberman said.

Lieberman put the stop-and-frisk policy in the context of Bloomberg's philanthropic efforts to address the hurdles faced by young, underprivileged men in New York City. Police stops "are a significant part of the problem," she said.

The NYPD has said the practice has helped to bring down crime numbers and save lives. Homicides dropped 4% in 2011 compared to the low tally from the year before, and in total remained under 600 for the 10th straight year. Major crime, which includes violent offenses and serious theft, ticked up by less than 1% last year.

On Monday, NYPD spokesman Paul Browne estimated that over the past 10 years, there were 5,628 fewer homicides than in the decade before Bloomberg took office — as a result, in part, of the stop-and-frisk policy.

"There is no empirical data that shows stop and frisk reduces crime," Charney countered on Tuesday.

Councilman Williams, who represents Brooklyn, echoed that skepticism. "We cannot feel comfortable with these numbers," he said. "We cannot feel comfortable with a mayor who says just we don't care what you are saying, a commissioner who says we just don't care about what you are saying — we are going to do what we want anyways."

**<u>Exhibit B</u>**



# NYPD Stop-and-Frisk Statistics
## 2009 and 2010

The Center for Constitutional Rights (CCR)[1] has long been active in the movement to address racial profiling, particularly in New York City.[2] CCR filed Floyd, et al. v. City of New York, et al., a federal class action lawsuit against the New York City Police Department (NYPD) and the City of New York that challenges the NYPD's practices of racial profiling and unconstitutional stops-and-frisks.[3] Stop-and-frisk is the practice by which an NYPD officer initiates a stop of an individual on the street allegedly based on so-called reasonable suspicion of criminal activity. Stop-and-frisks occur at an alarming rate in communities of color, who often feel under siege and harassed by the police.

In 2009, a record 576,394 people were stopped, 84 percent of whom were Black and Latino residents — although they comprise only about 26 percent and 27 percent of New York City's total population respectively.[4] The year 2009 was not an anomaly. Ten years of raw data from the NYPD reveal that stops-and-frisks result in a minimal weapons and/or contraband yield. Moreover, the practice contributes to continued mistrust, doubt and fear of police officers in communities of color that are already scarred by systemic racial profiling and major incidents of police brutality and torture. There is a clear need for accountability, independent oversight and reform in the NYPD's use of stops-and-frisks.

**2009   Total Stops**



Black:   306,965
Latino:  178,690
White:   53,278

**2009   Arrests Made**
during stop-and-frisk

Black:   18,022
Latino:  10,959
White:   3,255

**2009   Summons Given**
during stop-and-frisk

Blac  18,842
Lati  11,847
White   3,114

**2009   Times Force Used**
during stop-and-frisk



Black:   75,424
Latino:  48,607
White:   10,041

**The NYPD's use of stops-and-frisks is still on the rise.** In 2008, the number of people stopped and frisked was 540,302. In 2009, it was 576,394. This is a 6.7% increase in one year and almost a 600% increase since 2002.

**Blacks and Latinos are disproportionately stopped.** In 2009, Blacks and Latinos represented 84% of those stopped. Blacks and Latinos compromise only 26% and 27% of the NYC population, respectively.



**2009 Totals**
Stops: 576,394
Frisks: 326,369

**2002 Totals**
Stops: 97,837
Frisks: 52,803



NYPD STOPS 2009
9% White
31% Latino
53% Black



NYC POPULATION 2009
47% White
26% Black
27% Latino

The information contained in this document does not necessarily reflect any of the conclusions, evidence or arguments that will be presented by plaintiffs in the lawsuit Floyd v. City of New York, 08 Civ. 1034 (SAS) (SDNY)



# NYPD Stop-and-Frisk Statistics
## 2009 and 2010

In a report issued in October 2010, renowned policing expert Jeffrey Fagan of Columbia University confirmed that the NYPD stopped-and-frisked New Yorkers without reasonable suspicion and engaged in a pattern of unconstitutional stops that disproportionally affected Black and Latino New Yorkers. The report also concluded that most stops occur in Black and Hispanic neighborhoods, and the main factor for determining who gets stopped, even after controlling for crime rates, is race. Additionally, Black and Latino New Yorkers are treated more harshly, more likely to be arrested rather than issued a summons and more likely to have force used against them than White suspects.

**Contraband yielded during NYPD stops during first half of 2010 and 2009**



**Stops resulted in extremely low weapons yields.** Weapons were recovered in 7,201 stops in all of 2009 — which represented only 1.25% of all stops. One of the NYPD's primary talking points regarding their stop-and-frisk policy has been that it keeps weapons off the street. These numbers clearly contradict that claim.

The information contained in this document does not necessarily reflect any of the conclusions, evidence or arguments that will be presented by plaintiffs in the lawsuit Floyd v. City of New York, 08 Civ. 1034 (SAS) (SDNY)

1 CCR works to advance and protect the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights. Founded in 1966 by attorneys who represented civil rights movements in the South, CCR is a non-profit legal and educational organization committed to the creative use of law as a positive force for social change. Learn more about CCR at: http://ccrjustice.org.

2 CCR is currently working with a wide range of community groups to develop a comprehensive Police Accountability and Transparency Project, which will advocate for city-wide police-reform efforts. Because of the city's enormous influence, we believe that police reform in New York City has the potential to set a standard for police departments nationwide.

3 The plaintiffs in this case represent the thousands of African American and Latino New Yorkers who have been illegally stopped on their way to work, in front of their homes or just walking down the street, primarily because of their race or ethnicity.

4 Census Bureau (http://censtats.census.gov/cgi-bin/pct/pctProfile.pl), Table DP-1. Profile of General Demographic Characteristics: 2000, Geographic area: New York City, New York.



centerforconstitutionalrights    666 Broadway, New York, NY 10012
212-614-6464    ccrjustice.org

**Exhibit C**

## Act Two. Is That a Tape Recorder in Your Pocket, or Are You Just Unhappy to See Me?

Ira Glass  It's This American Life. I'm Ira Glass. Our show today-- Right to Remain Silent. We have two stories of people who very much do not choose to remain silent. We've arrived at act two of our show. Act Two. Is That a Tape Recorder in Your Pocket, or Are You Just Unhappy to See Me? Adrian Schoolcraft is a New York City policeman who decided to secretly record himself and his fellow officers on the job-- all day, every workday, he says for 17 months. Including lots of days when he was ordered to do all kinds of things cops are not supposed to do. It's led to a small scandal, Several people removed from their jobs, and four investigations of the New York Police Department. Though Adrian insists he didn't get into this looking for trouble.

Graham Rayman  His father is a police officer, and, I would say, he went along with the program for a few years.

Ira Glass  This is the reporter who broke the story in The Village Voice about Adrian and what he recorded those 17 months, a reporter named Graham Rayman. When I asked Graham what Adrian, the person at the center of this scandal, is like, the first thing out of his mouth is--

Graham Rayman  I would describe him as an extremely earnest person, almost-- in this cynical age-- almost to the point of almost too earnest. He actually believed that he could get the police commissioner to change certain things about how the police department was being run.

Ira Glass  Adrian Schoolcraft was working in Brooklyn-- precinct 81, in Bedford-Stuyvesant, a rough neighborhood, mostly black, that was slowly gentrifying. The precinct is just seven blocks wide and 20 blocks long, roughly, and had 13 murders last year, which is a third of what it used to be. Adrian's kind of an electronics buff, and he bought himself one of those tiny digital recorders, tucked it in his breast pocket, and started recording-- as he walked his beat, when he talked to other cops--

Police Sergeant  All right, attention. Roll call.

Ira Glass  --morning roll calls.

Police Sergeant  Enison.

Enison  Here.

Police Sergeant  Lewis.

Adrian Schoolcraft  The only reason the thought entered my head was because-- to protect myself.

Ira Glass  This is Adrian.

Adrian Schoolcraft  Like any other officer would carry a recorder-- was to protect themselves from any false accusations. Usually from civilians who are upset.

Ira Glass  How big was the recorder?

Adrian Schoolcraft  Oh, about the size of a pack of gum.

Ira Glass  The atmosphere at the 81st precinct was set by its commander, Stephen Mauriello. When Mauriello showed up, Adrian Schoolcraft says, things changed. Offices were told to write more tickets, do more stop-and-frisks, arrest more people for low level offenses that they might otherwise let go-- get their numbers up.

Adrian Schoolcraft  The pressure definitely increased when he arrived and took over as the commanding officer. The analogy I would uses is like having a boot to the back of your heel. It is do this or else. The rent's due.

Ira Glass  The rent's due?

Adrian Schoolcraft  The rent is due. Pay the rent. Did you pay the rent last month?

Ira Glass  Pay the rent means did you get your numbers?

Adrian Schoolcraft  Correct.

Ira Glass  Now, it's perfectly legal for police to be told-- like anybody in any job-- here's the amount of work that we expect you to do, number of tickets and arrests that are normal for somebody in your job in this neighborhood. But what's not allowed is to penalize police officers who do not make those targets. We don't want police officers under such pressure to deliver numbers that they make stops and arrests and write summons with no valid reason, just to get their goals. Again, reporter Graham Rayman.

Graham Rayman  In other words, as a police supervisor I can't tell you, you better give me 20 tickets a month or else I'm going to transfer you to the graveyard shift. There can't be a direct relationship between the two.

Ira Glass  That's just against the rules.

Graham Rayman  It's against the law.

Ira Glass  Oh, it's against the law?

Graham Rayman  Yeah, there's a state law against that kind of thing. But what was happening in the precinct, and what the tapes show repeatedly, is that they were tying it to disciplinary action. They were threatening the cops. If you don't hit your numbers, you'll get

transferred, you'll lose your assignment, we'll change your partner, you'll go on a foot post, you can be given a worse assignment.

Ira Glass On November 1, 2008, one sergeant declares at a roll call, quote "they are looking at these numbers and people are going to be moved. They can make your job real uncomfortable, and we all know what that means." On December 8, 2008, the sergeant tells the officers that if they don't get their activity up, quote, "there's some people here that may not be here come next month."

Police Sergeant There's some people here that may not be here come next month.

Ira Glass Because officially the NYPD doesn't allow numeric quotas to be tied to job performance, you hear the supervisors in the recording sometimes get into real verbal contortions to get the point across. Like in this excerpt from a roll call the first month that Schoolcraft was recording, June 2008.

Police Sergeant The XO was in the other day. I don't know who was here. He actually laid down a number.

Ira Glass I'm just going to repeat this because it's hard to hear. "The XO was in the other day," that's a commanding officer, right?

Adrian Schoolcraft The Execuitve Officer.

Ira Glass Or, the Executive Officer. --"was in the other day. He laid down a number."

Police Sergeant All right. So, I'm not going to quote him on that, because I don't want to be quoted stating numbers.

Ira Glass I'm not going to quote him on that, because I don't want to be quoted stating members.

Police Sergeant All right. He wants at least three seat belts, one cell phone, and 11 others.

Ira Glass "He wants three seat belts, one cell phone, and 11 others." What does that mean?

Adrian Schoolcraft He wants three seat-belt summonses, tickets for people not wearing their seat-belt, one cell phone, someone driving in their car talking on the cell phone, and eleven others, there are dozens of other categories of summonses that you can give people.

Police Sergeant I don't know what the number is, but that's what he wants.

Ira Glass I don't know what the number is, but that's what he wants. That's a really-- what does that mean?

Adrian Schoolcraft

He's playing the same game. He knows he's not supposed to state a number, but he wants to get his point across. So it's kind of like, if you remember All the President's Men, it's a non-denial denial.

Ira Glass Adrian Schoolcraft says he isn't exactly sure when, but at some point he had decided that it was important to document the orders that he was given that he thought were out of line. He recorded roll calls where officers were constantly being told to do more stop-and-frisks, even though it's illegal to stop a random person on the street and frisk them without reasonable suspicion. In December 2008, a sergeant tells officers to stop-and-frisk quote, "anybody walking around, no matter what the explanation is." He recorded Stephen Mauriello, the commander the 81st precinct-- and the person Adrian Schoolcraft says really brought the hammer down for higher numbers-- ordering the officers to arrest everyone they see. This happens in a couple of recordings, like this one from Halloween 2008.

Stephen Mauriello Any roving bands-- you hear me-- roving bands more than two or three people--

Ira Glass He's saying "any roving bands of more than two or three people"-- he's talking about just people going around on Halloween night--

Stephen Mauriello I want them stopped--

Ira Glass I want them stopped--

Stephen Mauriello --cuffed--

Ira Glass --cuffed--

Stephen Mauriello --throw them in here, run some warrants.

Ira Glass --throw them in here, run some warrants.

Stephen Mauriello You're on a foot post? [BLEEP] it. Take the first guy you've got and lock them all up. Boom.

Ira Glass You're on a foot post? F it. Take the first guy you've got, lock them all up. Boom.

Stephen Mauriello We're going to go back out and process them later on, I've got no problems--

Ira Glass --go back out and then we'll come back in and process them later on."

Adrian Schoolcraft Yes. Yeah, what he's saying is, arrest people simply for the purpose of clearing the streets.

Ira Glass Again, Graham Rayman. He says the problem with that is--

Graham Rayman  There has to be a violation of the law to make an arrest. He's essentially making the arrest before the crime takes place.

John Eterno  This is an example of something that I would say-- they're going out in the street and just grabbing people-- that's unlawful imprisonment. It's an illegal arrest.

Ira Glass  That's John Eterno, a former New York City cop, who went up the ranks from officer to sergeant, to lieutenant, to captain. He now chairs the Department of Criminal Justice at Molloy College and researches and writes about police practices with Professor Eli Silverman. And he says that some of the things that Adrian Schoolcraft documented on his recordings were no surprise to anybody-- like sergeants hounding officers to get their numbers up. That's been happening in every precinct for a long time, he says. But for commanders to tell cops, just lock people up and figure it out later-- Eterno says the word for that is kidnapping.

John Eterno  That's exactly what it is. They're just pulling people off the street. It's an unlawful imprisonment and they're being kidnapped. If they don't have probable cause, you cannot grab people off the street. It is kidnapping. At this point, from what I'm hearing on this tape, it seems to me that this is probably illegal behavior that's taking place on the part of the police department.

Andre Wade  We were arrested, they take us to the 81st precinct, put us in lock up for maybe an hour or two. And they processed us and checked for warrants. And once they see no warrants, they let us go, but we were still issued a citation.

Ira Glass  Andre Wade has lived in the neighborhood for over twenty years. He's a commercial driver. One day, he and two friends were picking up his brother to go to work together. They were standing on the sidewalk, and a police officer came over, and said they were trespassing. When his brother came down and confirmed, no, no they were there to pick them up, Andre says the officer wouldn't listen.

Andre Wade  He was just saying stuff like, you know you're not supposed to be standing here. He started getting upset when we were trying to talk him out of giving us the citations. And it's like he just got out of control. He got real erratic and got on the radio. And the next thing you know, we turn around and there's eight, nine police cars. It was to the point to where you would think that somebody was getting arrested for murder, or something like that. And they were just jumping out of their vehicles, and me and my buddies already knew that we were in for a ride.

Ira Glass  The citation that the police gave Wade lists his name, the day that he's supposed to appear in court, but in the spot where it's supposed to specify his crime--

Andre Wade  Yes, in that field of the ticket there was nothing-- no violation. The violation was blank.

Ira Glass  One of the producers of our radio show lives in the 81st precinct. And she says that it's one of those neighborhoods where everybody has stories of ridiculous tickets. One of her neighbors was

bringing his aunt home from the hospital, and he double parked. Two officers told him to move his car, and when he didn't, he was handcuffed, forced to lie down in the street, and tasered twice-- all in front of a crowd of people, including her, who live on the block and heard him calling for help. One common citation is for having an open container of alcohol. One neighbor says he was walking home from church with his six year old daughter, drinking a small carton of Tropicana orange juice, and he got a ticket for that. Others got tickets for water and Gatorade that was being given away at the park. George Walker has lived on the same block for over 40 years and says older guys like him get a lot of tickets. He thinks maybe they're targeted because they don't give the cops any fuss. He says he's gotten a dozen tickets this past year, nearly all for open container, even though he says he wasn't drinking alcohol.

George Walker Every last ticket was dismissed. Every one was not a valid ticket. Because if you see someone drinking alcohol, and you give them a ticket for open container, you have to name what they were drinking. But if they can't name it, they just say cup with alcohol in it. But that's not the name of the alcohol, so it gets dismissed-- because it wasn't alcohol in the first place. But they feel like they can do anything the want to us.

Ira Glass So in this police station, where everybody's obsessed with how many tickets they're writing-- where cops are told to pull people off corners and throw them in jail and figure out later what to charge them with-- comes Adrian Schoolcraft, who had no interest in making his numbers.

Adrian Schoolcraft No, I never tried to make anything happen. I went out there, and you walk you beat. And whatever happened, happened.

Ira Glass When you would talk to other officers in the precinct, did you have friends who felt the same way?

Adrian Schoolcraft Yes.

Ira Glass And would they not get the numbers, or would they get the numbers?

Adrian Schoolcraft They would get the numbers. It's easier. Especially if you have a wife, kids. Then they're devoted to their pension and retiring.

Ira Glass Do you not have a wife and kids?

Adrian Schoolcraft No.

Ira Glass And so you wouldn't go up to people just to give them a ticket?

Adrian Schoolcraft No.

Ira Glass Because?

Adrian Schoolcraft

It just wasn't right. I found I was getting along with a lot of the local business owners, and I started interacting with the residents, and they would tell me who the problems were. Now, if you start messing with the residents, and you start going into the barber shops and writing summonses that I don't feel police officers have any business writing-- they didn't sweep the floor of hair-- these are the same people that could help you perform your job as a patrolman or a police officer. That was my philosophy, and it did work.

Ira Glass  And so did you get a lot of heat for doing this?

Adrian Schoolcraft  He [UNINTELLIGIBLE] pressure from supervisors.

Ira Glass  What would they do?

Adrian Schoolcraft  Well I think they considered the foot post punishment, but I always enjoyed the foot post. But there's also hospitalized prisoners, prisoner transports.

Ira Glass  So they would assign you to these lousy posts?

Adrian Schoolcraft  Yeah. To get my mind right, they would try those, but I accepted those as normal duties as a police officer.

Ira Glass  But we still haven't gotten to the most disturbing thing documented by Adrian Schoolcraft and his recordings. Schoolcraft shows, over and over, that sometimes when real crimes would happen, serious crimes, the 81st precinct would reclassify them as lesser crimes-- or simply not put them in the system at all-- to make it look like the precinct was doing a better job driving down crime rates than it really was. Again reporter Graham Rayman.

Graham Rayman  There's a remarkable conversation that Schoolcraft has with another officer. And the other officer is just telling him three anecdotes of how the precinct commanding supervisor basically dumped three criminal complaints that should've been recorded.

Ira Glass  Yeah, what are the stories that he tells?

Graham Rayman  One is-- a young woman reports her cell phone was robbed, and the precinct commander basically says--

Police Officer  --what do you want me to do? What do you want to do with this?

Graham Rayman  What do you want us to do with this? How are we going to solve this? Are you going to get your phone back? You're not going to get your phone back.

Police Officer  I mean, he's like, "well, what if we can't get it back?" He's like, "are you going to press charges?"

Graham Rayman  He basically talks her out of filing a complaint, and that should be a robbery that should go in their numbers. And one of the other ones is-- the precinct commander responds to a report of a stolen vehicle. And his first question is, he asks the victim have you done jail time?

Police Officer  He's like, "you ever been arrested before?" He's like, "yeah." And he's like, "what for?"

Graham Rayman  --which is not really a proper question to ask of a crime victim. But he asks it, and the guy says yes. Yeah, I did eight years in prison when I was younger. And the precinct commander says maybe karma stole your car.

Police Officer  "So you think maybe Karma woke up this morning and took your car?"

Adrian Schoolcraft  Karma as in the spiritual--

Police Officer  He was like, "no, I don't think Karma takes cars." He's like, "I think somebody took my car."

Adrian Schoolcraft  So he didn't take his report because he's a felon?

Police Officer  Yeah. Basically.

Ira Glass  In the end, this cop tells Adrian, their supervisor, Stephen Mauriello, told him to file the case as an unauthorized driver.

Graham Rayman  --meaning that the guy loaned his car to somebody else who now has it.

Ira Glass  Then when the officer tried to file it that way, because he didn't have a name for the unauthorized driver, he couldn't file it at all. So the robbery went unreported. Rules go into effect in the 81st precinct that make it harder to report serious crimes. Officers are told that if there's a robbery, one of their supervisors has to come out to the scene themselves. And robbery victims are told that if they don't come into the police station, no crime report will be filed at all. After Graham Rayman started publishing these stories about Adrian Schoolcraft, retired cops and some on-duty cops started contacting him with their own anecdotes about crimes being downgraded from serious to much less serious-- the most shocking of these from a high ranking detective name Harold Hernandez.

Graham Rayman  He's a very distinguished detective. He was working in the 33rd precinct in Washington Heights. And one morning he comes into work and there's a guy who's accused of first degree rape sitting in his interview room. So he sits down and he looks at the guy. And he has a little twinge, and he says, have you ever done this before? And the guy said, yeah. And Hernandez says, how many times? And he says, oh, I don't know, seven or eight. And Hernandez says, where? And he goes, in this neighborhood. And Hernandez is now dumbstruck because there's been no report of a serial rapist-- sexual predator-- working the neighborhood.

Ira Glass  Like, no crimes have shown up. People haven't shown up saying they've been raped or assaulted.

Graham Rayman  He hasn't been notified. And he would be notified as a senior detective in the unit. It would be a very big deal. And so he says, can you give me the dates and locations? And the guy says, well, I can try, but you're going to have to take me around and I'll show. I'll show you. So he and a fellow detective get in the car and they drive around. And they look, and the suspect-- whose name is Darryl Thomas-- points out the locations. And then Hernandez takes his notebook and he writes down the locations. And then he goes back and he looks through stacks of crime complaints. And he finds them. And he realizes that they've been classified-- they've been downgraded. They've been classified either as criminal trespassing or criminal possession of a weapon-- both relatively minor crimes, given that the actual conduct in the narrative that the victims are describing is either first degree burglary, robbery, or sexual abuse, sexual assault. And he confronts his bosses about it. He confronts the precinct commander. And he confronts his detective squad commander. And everyone just shrugs. Meanwhile everyone's terrified that it's going to come out-- that these women are going to go to the press, and it's going to be a huge embarrassment, a huge scandal for the department. And if it had come out, it would have been a huge scandal for the department. But the department was able to keep it quiet. The District Attorney's office prosecuted Thomas and he went away for 50 years. But here's the interesting part-- they never publicized the case. There was never a press release issued about it. There was never a news article written about the case.

Ira Glass  Normally, Graham says, that a case like this-- serial rapist-- they'd try to get some press. But the misclassifications of the crimes would have made the NYPD look bad. No one was ever disciplined for what happened, for downgrading. The precinct commander was promoted twice by Commissioner Kelly.

Ira Glass  The guy who was in charge of that precinct where all this stuff happened?

Graham Rayman  Where this stuff happened. He's been promoted twice. It just went on, business as usual. Hernandez-- here's a guy who probably would've stayed in the department for 35 years, 30, 35-- as long as he could. But he was so upset about this incident and about other instances of downgrading and of manipulation of the crime stats that he retired.

Ira Glass  And so the NYPD has denied that crimes were downgraded like this.

Graham Rayman  Yeah. Well, they said that it only happens in a very tiny percentage of cases. And they say that the crimes stats are audited very carefully, And if it was a wider problem it would be spotted.

Ira Glass  The New York Police Department declined our request to come onto the radio or to have the officers who supervised Adrian Schoolcraft, and who are heard on his recordings, to be interviewed about their side of all this. But the pressure on police commanders to get better numbers really goes back to 1994, when New York started tracking crimes with a system called CompStat. CompStat, for the

first time, gave commanders timely, accurate data once a week on what crimes are happening, so they could send more cops to deal with it. Chances are you've heard of all this. It became one of the best known successes in modern policing. Serious crime has dropped an astonishing 77% in New York City since CompStat began in 1994. Other cities very quickly started imitating it-- DC, Philly, LA. Baltimore's version of CompStat ended up in a recurring plot line on the TV show The Wire, where street cops are told by the bosses to do anything to pump up their numbers. And the problem with CompStat, says Professor Eli Silverman, who studies the way police forces use numbers, is that the early success of CompStat created the expectation that numbers must get better every single year, no matter what.

> Eli Silverman  In the beginning it was like an orange. You could squeeze juice from an orange in the beginning much more readily than you can as you extract juice from that orange. And now, it gets harder and harder to drive crime down, because you're compared to not how you were in '94, but how you were last year the same week. And when something's pushed to the excess that it is now, and numbers dominate the system, that's when you have negative consequences.

Ira Glass  As apparently the one person in the 81st precinct who was not obsessed by the numbers, Adrian Schoolcraft, by January 2009, had so displeased his bosses that they gave him a failing job evaluation that covered the entire year of 2008-- which meant one thing, Schoolcraft says.

> Adrian Schoolcraft  They're starting a paper trail, and they'll just keep documenting. They're starting to move you out.

Ira Glass  He hired a lawyer and appealed the evaluation, but started feeling more pressure than ever to go out and do what his bosses wanted. He began to get stomach pains and tightness in his chest. He had trouble sleeping. Again, reporter Graham Rayman.

> Graham Rayman  I think within the precinct, he was probably seen as a little bit eccentric. And also, he wasn't going with the program. And anyone who doesn't go with the program is automatically marked.

Ira Glass  Schoolcraft began to feel that he was being retaliated against. He got written up for taking a bathroom break without putting it in his log. Another officer was written up for talking to him. When he went to the duty captain, he was told yes, he was being monitored.

> Duty Captain  Because of your past activity. When people at the same level as you and the same post as you, are doing a lot more than what you do when you're out there, we don't know if you're even out there. That's the problem.

Ira Glass  If there's a bunch of kids on a stoop and you're walking past, the duty captain asks him, and then named some addresses where that might happen, you just go on your merry way, because you don't see anything going on? Schoolcraft tells him he wouldn't just create fake charges. That's a common practice here, he says. Captain asks him what he means, and says in 19 years, he's never seen anybody create charges. Then he asks Schoolcraft the question again.

Duty Captain  Those kids on the step. Are you going to keep walking?

Adrian Schoolcraft  No.

Duty Captain  Are you going to ask them if they live there?

Adrian Schoolcraft  You usually won't get a response, but--

Duty Captain  Right. [BLEEP] you, Schoolcraft. Right?

Adrian Schoolcraft  That's how it usually happens.

Duty Captain  Yeah. Are you going to create something there? Because I could tell you that if that [BLEEP] told me to [BLEEP] myself. Yeah, so you go in the handcuffs for telling me that? Yeah. That's it. If you let that go because there's no violation, because he didn't break the law, then I feel bad for you. Because then you have a tough job. And then maybe you should find something else to do, you know? So if you call that creating something? You call that creating something? Or do you call that a matter of keeping the respect, because they'll step all over you when they see you out there. They'll do whatever they want in front of you when you're out there.

Ira Glass  Schoolcraft says that around this time, the recordings became about trying to keep his job. Somebody tells him that one of his bosses wants to force him out on psychiatric grounds.

Ira Glass  During this whole time that you were recording, who did you tell?

Adrian Schoolcraft  My father knew.

Ira Glass  Friends?

Adrian Schoolcraft  No.

Ira Glass  Fellow officers?

Adrian Schoolcraft  No.

Ira Glass  Were you tempted to tell anybody ever?

Adrian Schoolcraft  No.

Ira Glass  What'd your dad say?

Adrian Schoolcraft  He would ask me if I heard anything that day.

Ira Glass

And when you were getting these orders to get your numbers up and you wouldn't do it, what did your dad say about that?

Adrian Schoolcraft  He would just reiterate to me how the quota system-- wherever you are, whatever city you're in-- it's unethical and it's illegal.

Ira Glass  So he was on your side.

Adrian Schoolcraft  Yes.

Ira Glass  Finally in April, Schoolcraft takes off a week for stomach and chest pains and is sent to a police department doctor. The doctor finds nothing wrong with him physically.

Adrian Schoolcraft  And he asked me if I was experiencing stress or anything. I said, well, yes. Matter of fact, this is what's going on. And he said, are you sure you want to tell me this?

Ira Glass  Schoolcraft says he laid it all out for the doctor-- his bad performance evaluation, the numbers he was asked to hit, and also more personal disputes with his bosses about whether his evaluation was falsified, was the precinct doing training it claimed it was doing. And the police department doctor referred Schoolcraft to see a police department psychologist for an evaluation. And when Schoolcraft tells the psychologist the same things that he told the doctor, she asked him to turn in his gun and shield.

Adrian Schoolcraft  Well, she made it sound like it was normal. She said, it's not unusual for us to take an officer's gun and shield if he or she is having chest pains. Schoolcraft moves to a job answering phones at the precinct, where he continues to gather evidence. And in October, he finally talks to the people in the police department who investigate unethical practices-- the Internal Affairs Bureau, IAB-- and it doesn't go well. Schoolcraft says that not only did they seem very skeptical, he claims that Internal Affairs left phone messages for him at the precinct. He says this alerted his bosses to the fact that he was talking to Internal Affairs. Internal Affairs does start an investigation, though. And soon, Schoolcraft gets a phone call from the division of the police department whose main purpose is to make sure that crime reporting and statistics using CompStat are accurate. It's called the Quality Assurance Division. And at last, Schoolcraft says, somebody seems to take his accusations seriously. Investigators hear him out, ask lots of questions, and promise to look into it.

Qad Representative  I appreciate you coming in, and bringing [INAUDIBLE] to our attention.

Ira Glass  He doesn't tell them that he has recordings. In fact, as you can hear, he secretly records this three hour meeting with them. But he does give them documentation-- real evidence to back up his charges. And what happens next to Adrian Schoolcraft is very, very strange. Just a few weeks after his meetings with Internal Affairs and QAD, he shows up to work. It's the end of October.

Adrian  Schoolcraft

As soon as I sit down, a lieutenant approaches me and asks for my activity log. Well, this activity log is where I keep a lot of my notes regarding what people are saying and the times they're saying it.

Ira Glass  And all the things, basically, you're trying to report that you think are going wrong in the precinct.

Adrian Schoolcraft  Correct. And it wasn't until I got it back that I realized the cat was out of the bag. He had bent the corners on some of the pages, and I saw what piqued his interest. And I became very worried, how he was looming around me-- I felt threatened by it. And again, all these officers are armed. But I left with permission.

Ira Glass  Because you though, what was going to happen?

Adrian Schoolcraft  Well, I wasn't sure. I just felt his behavior worried me. And--

Ira Glass  But you thought he might provoke you into something, and then he would shoot you, or something?

Adrian Schoolcraft  That was one of the fears. I'm not just an officer inside. Now I'm an officer that has this psych issue. No one's supposed to know, but everyone knows that when you have your gun and shield taken, you've been psyched. And you have that brand on you. So what's going to happen? Are they going to say I lunged at him? Or are they-- any kind of scenario could play out. And I just didn't feel comfortable, so I left.

Ira Glass  How he left is in dispute. Schoolcraft says that he told a sergeant that he was feeling sick and went home an hour early. The police say the sergeant never said yes to this request. In any case, Schoolcraft went home and went to bed.

Adrian Schoolcraft  A few hours later, I received a phone call from my father, and he told me he received a phone call from my XO. He says, look outside your window. And I looked out my window and there were multiple police vehicles, and there seemed to be quite a crowd.

Police Officer  [KNOCKING] [INAUDIBLE]

Ira Glass  Adrian has no idea what they want, but he knows the situation is bad, so he starts recording.

Adrian Schoolcraft  31 October, 2009. [KNOCKING]

Ira Glass  The officers open Adrian's door with a key they get from his landlord.

Police Officer  Adrian! Police department, buddy. Let me see your hands.

Adrian Schoolcraft  They've just entered my home. And they were in their helmets, and gear, and tasers. They had the special weapon-- basically SWAT.

Police Officer  You all right?

Adrian Schoolcraft  Yeah, I think so.

Police Officer  Everybody's worried about you. They haven't heard from you.

Adrian Schoolcraft  Who's worried about me?

Michael Marino  Adrian, didn't you hear us knocking on this door for a couple of hours?

Adrian Schoolcraft  No. Why would I expect anyone to knock on my door?

Michael Marino  I don't know, Adrian. But if you hear somebody knocking, normally you get up and answer it. They were kicking on that door loud and yelling.

Adrian Schoolcraft  I wasn't feeling well.

Michael Marino  All right. Sit down. Sit down.

Ira Glass  That voice you just heard in Adrian's bedroom is a man of much higher rank than anybody in any of the recordings to this point. He's the number two commander for the NYPD for all of Brooklyn North, Michael Marino. Stephen Mauriello, the head of the 81st precinct, the commander that Adrian contends had been putting pressure on all the officers to deliver better numbers, is also there in the bedroom. He talks next.

Stephen Mauriello  You've got everybody worried. They're worried about your safety. All right?

Adrian Schoolcraft  Worried about what?

Stephen Mauriello  What do you mean, worried about what? They tried calling you. You got--everybody's been calling you. You just walked out of the precinct, you know? That's what we're worried about. Your safety, your well-being.

Adrian Schoolcraft  All right. I'm fine.

Ira Glass  Why does he keep saying that he's worried about your safety?

Adrian Schoolcraft  That's his excuse to come into my home.

Stephen Mauriello  Get your stuff on. We're going back to the precinct.

Adrian Schoolcraft  I'm not going back to the precinct.

Stephen Mauriello  Adrian, we're going to go back to the precinct.

Adrian Schoolcraft  For?

Stephen Mauriello  Because we're going to do it the right way. You can't just walk out of command--

Adrian Schoolcraft  What's going to be done if I go to the 8-1?

Stephen Mauriello  What's going to be done. We're going to investigate why you left.

Adrian Schoolcraft  I'm telling you why I left. I was feeling sick.

Stephen Mauriello  Adrian, that's not the reason why you leave. All right, you know that.

Ira Glass  Adrian knows the rules and he asks if he's under arrest. He's not under arrest. But the number two commander for Brooklyn North, Michael Marino, tells him he's giving him an order.

Michael Marino  Listen to me. I'm a chief in the New York City Police Department, and you're a police officer. So this is what's going to happen, my friend. You've disobeyed an order, and the way you're acting is not right, at the very least.

Adrian Schoolcraft  Chief, if you--

Michael Marino  Stop right there.

Adrian Schoolcraft  --open up your house--

Michael Marino  Stop. Stop right there, son.

Adrian Schoolcraft  --how would you behave?

Michael Marino  Son, I'm doing the talking right now, not you.

Adrian Schoolcraft  In my apartment.

Michael Marino  In your apartment. You are going--

Adrian Schoolcraft  Is this Russia?

Michael Marino  You are going to be suspended. All right? That's what's going to happen. You're suspended son.

Adrian Schoolcraft  That's when I found out what they-- that's what they were so desperate to accomplish.

Ira Glass  How many people are in your bedroom at this point?

Adrian Schoolcraft  In the bedroom, at all times, there's at least four. And then there's a living room-- at least a dozen.

Ira Glass  If this seems like an extreme response to you, reporter Graham Rayman confirms, it is.

Graham Rayman  Yeah, it's very extreme for going home from work early-- an hour early.

Ira Glass  An officer asks Adrian if he wants medical aid-- an EMT to come check him out. Adrian's blood pressure turns out to be sky high. They offer to take him to a hospital, but not his local hospital-- to one that he's never heard of. And he doesn't get what they're up to, and he refuses medical attention. Under the law, they should leave him alone. But for some reason, they will not take no for an answer.

Stephen Mauriello  Adrian, lie down in the bus and we'll go.

Adrian Schoolcraft  I can lie down in my own bed. I haven't done anything wrong.

Stephen Mauriello  Yeah, you have.

Adrian Schoolcraft  OK, file it. Write it up.

Stephen Mauriello  Now, it's a matter of your health.

Michael Marino  Adrian, listen to me. All right, son?

Ira Glass  Again, this is Deputy Chief Marino, from Brooklyn North.

Michael Marino  Right now, EMS is saying that you're acting irrational-- this is them, not us-- and that if you go to the hospital, listen to me--

Adrian Schoolcraft  Yeah, and you're whispering in their ear--

Michael Marino  Adrian, they are not--

Adrian Schoolcraft  Chief, do what you've got to do.

Michael Marino  --listen to me. Now you have a choice. You get up like a man and put your shoes on and walk into that bus--

Adrian Schoolcraft  Like a man.

Michael Marino  --like a man. Or son, they're going to treat you as an EDP and that means handcuffs. And I do not want to see that happen to a cop.

Ira Glass  EDP is?

Adrian Schoolcraft  Emotionally Disturbed Person.

Michael Marino  Son, you've caused this.

Adrian Schoolcraft  I didn't cause anything.

Michael Marino  You have caused this. Now you have a choice. They're saying you have to go to the hospital. That's EMS. These are trained medical professionals. And if you don't go, then you're not acting rationally. And they say now they're afraid you're emotionally disturbed.

Adrian Schoolcraft  It was all very surreal. At that point right there, he's very agitated. His face is red, and I knew then that anything could happen. I had no witnesses. No one was living with me.

Michael Marino  So you have a choice. What is it going to be?

Adrian Schoolcraft  I'm laying right here until I feel better.

Michael Marino  OK, son. He's EDP. He's EDP.

Police Officer  Put your hands behind your back.

Adrian Schoolcraft  Why am I putting my hands behind my back?

Michael Marino  Because you have to go to the hosptial. All right, just take him. I can't [BLEEP] understand him anymore.

Police Officer  Adrian, come here. Put your hands behind your back.

Adrian Schoolcraft  [GRUNTS]

Police Officer  Get your hands behind your back.

Adrian Schoolcraft  [GRUNTS]

Police Officer  Get one hand. Go ahead. Get one hand.

Adrian Schoolcraft  They pulled me off the bed. They slammed me to the floor. The way they were stomping on my back, they were pressing on my chest in a way that it was affecting my circulation.

Michael Marino  Adrian stop it.

Adrian Schoolcraft  My chest. Oh, my chest.

Ira Glass  During the struggle, as they cuff Adrian, the little recorder falls out of his pocket. Deputy Chief Marino spots it.

> Michael Marino  Absolutely amazing, Adrian. You put your fellow police officers through this. Absolutely amazing. Yeah, it's a recorder. Recording devices, and everything else-- so he's playing a game here. Cute.

> Ira Glass  So if he found that recorder, how are we hearing this tape?

> Adrian Schoolcraft  No, he found the recorder that was in my pocket. There was another recorder. The one that was running was just a recorder on the shelf.

> Ira Glass  In plain sight?

> Adrian Schoolcraft  I had some books around it.

Ira Glass  Now that Deputy Chief Marino has labeled Schoolcraft EDP, the police take Schoolcraft and commit him to a psychiatric ward, saying he was a danger to himself. Schoolcraft, who had spent months documenting his bosses telling cops to lock people up on contrived pretenses, now found himself locked up on contrived pretenses.

> Adrian Schoolcraft  They told the hospital staff that I left work early, I yelled at my supervisor-- and I swore at my supervisors, cursed at them-- that I ran from them, and I barricaded myself in my home.

> Ira Glass  But the tapes showed that isn't true.

> Adrian Schoolcraft  Correct, no. None of that happened.

Ira Glass  Schoolcraft's father, the last person Schoolcraft talked to, is unable to find him for days. The last he heard, his son was in an apartment surrounded by police, the next, he just vanished. His father says he called Internal Affairs, the FBI, the press. Finally he located him by calling around the hospitals all over Queens.

> Adrian Schoolcraft  That's the only way I got out, because he confronted the hospital administration and said, here's my son's health care proxy, I'm his father. Why have you imprisoned my son here? And they had no answer, and they had to release me.

> Ira Glass  Why do you think they went so far with you?

> Adrian Schoolcraft  It seemed like an act of desperation. Panic.

> Graham Rayman  You can look at it in a couple of different ways.

Ira Glass  Again, reporter Graham Rayman.

Graham Rayman  One is that they put him in the psych ward because he tried to report corruption and misconduct. They literally tried to destroy his reputation.

Ira Glass  Like, he's literally crazy. That's the message.

Graham Rayman  Yeah, right. That they were trying to portray him as crazy. You could also look at it-- that the chief lost his temper that night. Just got angry and gave an order that turns out to be a totally inappropriate order. I could see that being the case also.

Ira Glass  At the time that he led the raid on Schoolcraft's apartment, Deputy Chief Michael Marino was already under a microscope. It was just a month after he had been put on trial inside the department after a sting named him as one of 27 cops who illegally bought human growth hormone, or steroids. Marino claimed that he used the human growth hormone for a medical condition. And back in 2006, an arbitrator found that Marino was in violation of New York labor laws for a very similar situation to the one that Schoolcraft was documenting. The arbitrator ruled that Marino had set up an illegal quota for police officers of four parking tickets, three moving violations, three quality of life summons, and two stop-and-frisk per month and then penalized the officers when they didn't make the quota.

Adrian Schoolcraft  I didn't figure I would lose my job.

Ira Glass  Adrian Schoolcraft says that in the end, none of this worked out the way he thought it would during all those months of recording.

Adrian Schoolcraft  I figured someone would approach the supervisor and say, listen you got caught. Knock it off. And everything's in house, still. Just knock it off. This is getting out of control. I never saw myself as an adversary.

Ira Glass  Because you assumed that the police commissioner-- the people at the very top of the police force-- that they would be on your side.

Adrian Schoolcraft  Correct.

Ira Glass  But now do you believe that, in fact, they would be on your side?

Adrian Schoolcraft  I don't believe they were, or ever intended to be.

Ira Glass  That's the question, of course. And there's really no way to know how typical the 81st precinct is. Reporter Graham Rayman has heard from retired cops who say the same things happened where they worked. And he's found a policeman who was secretly recording in the Bronx at the same time as Schoolcraft finding the same things. The guys who study the way CompStat is used by the police, John Eterno and Eli Silverman, say manipulating stats to get better numbers seems to happen in a lot of places where CompStat is used.

Eli Silverman

There's evidence of the same kind of distortion-- we've done research, where people have written in our blog-- from other countries, UK, Australia, as well. Commanders attesting to the same phenomenon. This is not unique to New York.

Ira Glass  Having failed to reach any results working inside the department, Schoolcraft finally went to the press. And Graham's five-part series in The Village Voice has been, Adrian says, like a meteor hitting the 81st precinct. The police commissioner transferred Commander Stephen Mauriello, and some of the other senior-level supervisors, out of the precinct. Though he only did that after several weeks of pressure from politicians and clergy. There's now one police investigation into Schoolcraft's allegations, there's another investigation of Deputy Chief Marino's order to put Schoolcraft into a psych ward, another into the charge that serious crimes were downgraded to lesser ones, and a fourth that is just about the misclassification of crimes in Detective Hernandez's sexual assault case. Schoolcraft's recordings will be used in two class action lawsuits, one about stop-and-frisks, one about quotas. Schoolcraft himself is suing the department for $50 million. Two officers have come forward to back up his charges. A website, schoolcraftjustice.com has been set up looking for more. Schoolcraft himself is suspended without pay, living with his dad, 350 miles away, in upstate New York-- where, he says, a dozen times city police have shown up and pounded on his door, yelling, "NYPD, we know you're in there. Open up." [KNOCKING] Of course, he recorded it.

Police Officer Adrian, we know you're in there. Just open the door please, so we can get back to New York.

Ira Glass  Schoolcraft assumes that he'll never again work as a police officer anywhere.

Ira Glass  Is it weird not to be a policeman anymore?

Adrian Schoolcraft  It feels odd. But I still feel like I am a policeman. I'm going forward with this investigation. I just feel like this is my case. This is the one. And I'll go all the way with it.

Ira Glass  And finally, with the 81st precinct under new supervision, the numbers on serious crime have risen by 10-15%. Are the crimes going up, or that's closer to the true amount of crime that was already there, only now being recorded? [MUSIC - "OFFICER" BY THE PHARCYDE] Well, our program today was produced by me and Sarah Koenig, with Alex Blumberg, Ben Calhoun, Jane Feeltes, Jonathan Menjivar, Lisa Pollak, Robin Semien, and Alissa Shipp and Nancy Updike. Our senior producer is Julie Snyder. Seth Lind is our production manager. Emily Condon's our office manager. Music help from Jessica Hopper. Production help from Shawn Wen. [ACKNOWLEDGEMENTS] This American Life is distributed by Public Radio International. WBEZ management oversight of our program by our boss, Mr. Torey Malatia, who's got no problem with the end of Don't Ask, Don't Tell. Seriously.

Joe Lipari  No, I have a gay cousin. I am the least homophobic person in the world.

Ira Glass  I'm Ira Glass. Back next week with more stories of This American Life.

**Exhibit D**

# The NYPD Tapes: Inside Bed-Stuy's 81st Precinct

By Graham Rayman Tuesday, May 4 2010

Comments (143)  A A A

...continued from page 2

"Pick it up a lot, if you have to," he says. "The CO gave me some names. I spoke to you."

While the NYPD can set "productivity targets," the department cannot tie those targets to disciplinary action: "What turns it into an illegal quota is when there is a punishment attached to not achieving, like a transfer or loss of assignment," says Al O'Leary, a spokesman for the Patrolmen's Benevolent Association.

In the 81st Precinct, however, the tapes indicate that "activity" was routinely tied to direct and implied threats of discipline. The message, relayed down the chain from headquarters, is repeated over and over again in the roll calls by the precinct commander, the lieutenants, and the sergeants.



C.S. Muncy

On October 28, 2008, for example, the precinct commander, Mauriello, tells officers he will change their shifts if they don't make their numbers: "If I hear about disgruntled people moaning about getting thrown off their tours, it is what it is. Mess up, bring heat on the precinct—you know what, I'll give you tough love, but it doesn't mean you can't work your way back into good graces and get back to the detail and platoon you want."



C.S. Muncy

He adds: "If you don't work, and I get the same names back again, I'm moving you. You're going to go to another platoon. I'm done. I don't want to be embarrassed no more."

On July 15, 2008, he says, "I don't want to see anyone get hurt. This job is all about hurting. Someone has to go. Step on a landmine, someone has to get hurt."

On December 8, 2008, he excoriates officers who failed to write enough tickets for double-parking, running red lights, and disorderly conduct, and who failed to stop-and-frisk enough people.

## Details

Follow continuing coverage of the NYPD Tapes here at our Runnin' Scared blog. The Voice presents excerpts from "The NYPD Tapes: Inside Bed-Stuy's 81st Precinct," from precinct roll calls between June 1, 2008 and Oct. 31, 2009.

**JANUARY 28, 2009**
**"How Many Superstars and How Many Losers Do You Have"**

In this excerpt, the 81st Precinct commander, a lieutenant and a sergeant talk about the constant pressure from bosses, and push cops to "get their numbers."



**JUNE 12, 2008**
**"The Hounds are Coming"**

"I see eight fucking summonses for a 20-day period or a month," he says. "If you mess up, how the hell do you want me to do the right thing by you? You come in, five parkers, three A's, no C's, and the only 250 you do is when I force you to do overtime? I mean it's a two-way street out here."

Later, he adds, "In the end, I hate to say it—you need me more than I need you because I'm what separates the wolves from coming in here and chewing on your bones."

In the same roll call, Sergeant C. adds: "When I tell you to get your activity up, it's for a reason, because they are looking to move people, and he's serious. . . . There's people in here that may not be here next month."

The pressure is the worst at the end of the month and at the end of every quarter, because that's when the precinct has to file activity reports on each officer with the borough command and police headquarters. (Put another way: If you want to avoid getting a ticket, stay away from police officers during the last few days of the month, when the pressure for numbers is the highest.)

From the tapes, it's not hard to imagine an officer desperately driving to the precinct, looking for someone smoking pot on a stoop or double-parking to fill some gap in their productivity.

In a roll call from September 26, a Sergeant F. notes that the quarter is coming to an end, and a deadline is nearing for applying to take the sergeants' exam. "If your activity's been down, the last quarter is a good time to bring it up, because that's when your evaluation is going to be done," he says. "We all know this job is, 'What have you done for me lately?' "

He goes on to lay on the pressure for more numbers. "This is crunch time," he says. "This is Game Seven of the World Series, the bases are

Precinct supervisors talk about a specific "numbers" quota, warn cops to pick up their numbers, or else, and complain about outside inspections.

[View Media]

SEPTEMBER 1, 2009
"Just Knock It Off, All Right? We're Adults"

In this roll call, a supervisor tells officers to stop drawing penises in each other's memo books and drawing graffiti on the walls. There's also an extended speech on the virtues of personal hygiene.

[View Media]

SEPTEMBER 26, 2009
"This Is Crunch Time"

The pressure for "numbers" (summonses, arrests, stop and frisks and community visits) was worst at the end of each month and the end of each quarter because that's when individual officers had to file their activity reports. In other words, stay away from cops after the 25th of the month.

[View Media]

OCTOBER 4, 2009
"It's Not About Squashing Numbers"

In this roll call, precinct supervisors order officers to be skeptical about robbery victims, and tell the cops that the precinct commander and two aides call victims to question them about their complaints.

[View Media]

OCTOBER 12, 2009
"How Do We Know This Guy Really Got Robbed?"

Police officers are supposed to take crime complaints, but in this roll call, a sergeant tells cops not to take robbery complaints if the victim won't immediately return to speak with detectives. She questions the victim's motives, too.

[View Media]

## Related Content

Barbara Long Gets a Crotch-Full From Joe Namath
July 23, 2010

Ray Kelly, NYPD, Sued For Refusing to Release Crime Stats From Scandal-Tained Brooklyn Precinct
January 10, 2012

Al Vann, Brooklyn Councilman, Says NYPD Breaking the Law By Not Releasing Audits of Crime Numbers
January 12, 2012

NYPD Hit With Flurry of Bad Raid Lawsuits
February 15, 2012

Eterno and Silverman, Criminologists, Say NYPD's Crime Stat Manipulation A Factor In Recent Corruption Scandals
November 29, 2011

loaded, and you're at bat right now. . . . It's all a game, ladies and gentlemen. We do what we're supposed to, the negative attention goes somewhere else. That's what we want."

And take August 31, 2009. Sergeant Rogers tells his officers, "Today is the last day of the month. Get what you need to get."

Or as Sergeant F. says just a few days before that: "It's the 26th. If you don't have your activity, it would be a really good time to get it. . . . If I don't have to hear about it from a white shirt [a superior officer], that's the name of the game."

IT'S ALSO CLEAR FROM THE recordings that supervisors viewed the constant pressure for numbers as an annoyance, busy work to fill the demand from downtown. "We had a shooting on midnight on Chauncey, so do some community visits, C summonses over there, the usual bullshit," Sergeant A. says in an August 22, 2009, roll call.

The obsession with statistics at police headquarters bleeds out into the borough commands as well. In early 2009, the Brooklyn North patrol command started holding its own CompStat meetings, reviewing everything from crime stats to the number of tickets written by each officer to sick reports.

The move was seen in the precinct as yet another layer of unnecessary oversight. "This job is just getting tighter and tighter with accountability," Lieutenant B. says on January 13, 2009. "So there are certain things I'd like to get away with, but I can't anymore. It just goes down the line and, eventually, it falls on you."

## More About

Steven Mauriello          Adrian Schoolcraft

New York City Police      Police
Department
                          Robbery

## Like this Story?

Sign up for the Weekly Newsletter: (Sent out every Thursday) Our weekly feature stories, movie reviews, calendar picks and more - minus the newsprint and sent directly to your inbox.

enter email

<< Previous Page | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Next Page >>

**Exhibit E**

Jabari Bishop
321 West 54th Street, Apt. No. 310
New York, New York 10018

December 19, 2011

**VIA; BY HAND**
CITY OF NEW YORK
Corporation Counsel
100 Church Street, 4th Floor
New York, New York 10007

Attention: Corporation Counsel

**Re: Request for a Litigation Hold**

Dear Corporation Counsel:

In response to racial profiling, illegal "Stop & Frisk" and violation of my fundamental Civil Rights protected under the United States Constitution, New York Constitution and New York Common law, that were perpetrated by three members of the City of New York Police Department, I am demanding that you place a litigation hold on any and all video/digital surveillance tape/images of events occurring on December 29, 2010, in front of the Soundview Houses, owned and operated by the City of New York, situated at 551 Rosedale Avenue, Bronx, New York 10473.

As per this request, the City of New York has a duty to preserve evidence, even without a court order. Because electronic data may be an irreplaceable source of discovery, I am demanding that the City of New York preserve all existing and potential electronic data that was captured on and by video surveillance cameras owned, operated, in the custody and control of the; (1) City of New York Police Department's THV Mobile Command Center, City of New York, which was posted on Rosedale Avenue and Randall Avenue on December 29, 2010; (2) City of New York Police Department's "Sky Watch" retractable watchtower, which was posted on Rosedale Avenue and Randall Avenue, on December 29, 2010; (3) City of New York Police Department  Public Service Area 8 and (4) City of New York Housing Authority.

## BACKGROUND

By way of background, The incident occurred on December 29, 2010, a Wednesday, at approximately 12:15 AM through 12:20 AM, while claimant was sitting in the passenger seat of a parked car, whose engine was turned off in front of 551 Rosedale Avenue, Bronx, New York 10473, a housing development named the Soundview Houses owned and operated by to the City of New York Housing Authority ("NYCHA"), three officers and employees of the NYPD surrounded the automobile in which Claimant was sitting in the passenger seat. The NYPD Officers without cause or reason knocked on the window of the automobile, ordered Claimant to roll down the window. Claimant rolled down the window as ordered. The NYPD officers without cause or reason ordered Claimant out the car. Claimant exited the car, whereupon, the NYPD police officers without cause or reason, ordered Claimant to stand against the car. Claimant stood against the car, whereupon, the NYPD Officers

without cause or reason frisked Claimant - patted down Claimant's entire body from head to toe - searched all of Claimant's pockets, socks, collars, and searched the automobile.

As a member of the Comptroller of the City of New York. it is your duty to contact all necessary parties (attorneys, Loss Prevention Department, managers, etc) that a proper litigation notification is issued and a litigation hold be implemented. Consistent with that duty, I request that the City of New York's video/digital surveillance tape/images for December 29, 2010 between the hours of 12am to 2 am in front of the NYCHA Soundview Houses, located at 551 Rosedale Avenue, Bronx, New York 10473, be preserved and maintained – in native format, and in accordance with the following safe guards.


## I.   ELECTONIC DATA TO BE PRESERVED

The following types of electronic data and/or or the electronic data of City of New York and the City of New York subsidiaries, divisions, agents, employees and relevant third-parties of vendors should be preserved in native formats, in accordance with the steps set forth below:

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is stored on your current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones).

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible definition and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically or optically stored as:

- Digital communications (e.g., e-mail, voice mail, instant messaging);
- Word processed documents (e.g., Word or WordPerfect documents and drafts);
- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data files);
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- Sound Recordings (e.g., .WAV and .MP3 files);
- Video and Animation (e.g., .AVI and .MOV files);
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, Yahoo, blog tools);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and,
- Back Up and Archival Files (e.g., Zip, .GHO)

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem *not* reasonably accessible. You are obliged to *preserve* potentially relevant evidence from *both* these sources of ESI, even if you do not

2

anticipate *producing* such ESI.

Accordingly, even ESI that you deem reasonably inaccessible *must be preserved in the interim* so as not to deprive the me of their right to secure the evidence or the a court of its right to adjudicate the issue.

## Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI including, without limitation, information with the *earlier* of a Created or Last Modified date on or after December 2010 through the date of this demand and concerning:

1. The events and causes of action described above; and
2. ESI you may use to support claims or defenses in this case;

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of ESI. *Be advised that sources of ESI are altered and erased by continued use of your computers and other devices.*

Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI.

*Nothing in this demand for preservation of ESI should be understood to diminish your concurrent obligation to preserve document, tangible things and other potentially relevant evidence.*

## Suspension of Routine Destruction

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:
• Purging the contents of e-mail repositories by age, capacity or other criteria;
• Using data or media wiping, disposal, erasure or encryption utilities or devices;

• Overwriting, erasing, destroying or discarding back up media;
• Re-assigning, re-imaging or disposing of systems, servers, devices or media;
• Running antivirus or other programs effecting wholesale metadata alteration;
• Releasing or purging online storage repositories;
• Using metadata stripper utilities;
• Disabling server or IM logging; and,
• Executing drive or file defragmentation or compression programs.

3

## Guard Against Deletion

You should anticipate that your employees, officers or others may seek to hide, destroy or alter ESI and act to prevent or guard against such actions. Especially where company machines have been used for Internet access or personal communications, you should anticipate that users may seek to delete or destroy information they regard as personal, confidential or embarrassing and, in so doing, may also delete or destroy potentially relevant ESI. This concern is not one unique to you or your employees and officers. It's simply an event that occurs with such regularity in electronic discovery efforts that any custodian of ESI and their counsel are obliged to anticipate and guard against its occurrence.

## Preservation by Imaging

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like). With respect to local hard drives, one way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bitstream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

With respect to the hard drives and storage devices of each of the persons named below and of each person acting in the capacity or holding the job title named below, as well as each other person likely to have information pertaining to the instant action on their computer hard drive(s), demand is made that you immediately obtain, authenticate and preserve forensically qualified images of the hard drives in any computer system (including portable and home computers) used by that person during the period from December 29, 2010 to March 31, 2012 as well as recording and preserving the system time and date of each such computer.

Once obtained, each such forensically qualified image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

## Preservation in Native Form

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means or make it difficult or burdensome to access or use the information efficiently in the litigation.
You should additionally refrain from actions that shift ESI from reasonably accessible media and

4

forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible

## Metadata

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. Be advised that metadata may be overwritten or corrupted by careless handling or improper steps to preserve ESI. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

## Servers

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server depending upon, e.g., its RAID configuration and whether it can be downed or must be online 24/7. If you question whether the preservation method you pursue is one that I will accept as sufficient, please call to discuss it.

## Home Systems, Laptops, Online Accounts and Other ESI Venues

Though I expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems may contain potentially relevant data. To the extent that officers, board members or employees have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drives, CD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.). Similarly, if employees, officers or board members used online or browser-based e-mail accounts or services (such as AOL, Gmail, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

## Ancillary Preservation

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters or the like.

You must preserve any passwords, keys or other authenticators required to access encrypted

files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI.

You must preserve any cabling, drivers and hardware, other than a standard 3.5" floppy disk drive or standard CD or DVD optical disk drive, if needed to access or interpret media on which ESI is stored. This includes tape drives, bar code readers, flash drives, Zip drives and other legacy or proprietary devices.

### Paper Preservation of ESI is Inadequate

*As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions.* If information exists in both electronic and paper forms, you should preserve both forms.

### Agents, Attorneys and Third Parties

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

### System Sequestration or Forensically Sound Imaging

I, suggest that, with respect to, City of New York's Corporation Counsel and other attorneys,  issuance carriers, managers, employees and any other party removing their ESI systems, media and devices from service and properly sequestering and protecting them may be an appropriate and cost-effective preservation steps.

In the event you deem it impractical to sequester systems, media and devices, I believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices is expedient and cost effective. As I anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, I demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

By "forensically sound," I mean duplication, for purposes of preservation, of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including in the so-called "unallocated clusters," holding deleted files.

### Preservation Protocols

6

I am are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol, if you will furnish an inventory of the systems and media to be preserved. Else, if you will promptly disclose the preservation protocol you intend to employ, perhaps I can identify any points of disagreement and resolve them. A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, I urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps my respective experts can work cooperatively to secure a balance between evidence preservation and burden that's fair to both sides and acceptable to a Court of law and equity.

### Do Not Delay Preservation

I'm available to discuss reasonable preservation steps; however, *you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay.* Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which I are entitled, such failure would constitute spoliation of evidence, and I will not hesitate to seek sanctions.

### Confirmation of Compliance

Please confirm by January 19, 2012, that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to the events of as described herein-above, on December 29, 2010. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

Yours, etc.,

Jabari Bishop